Constantine **EVANGELINOS** et al., **Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC.,** a corporation, **Defendant.**

**Civ. A. No. 74-165.**

United States District Court, W. D. Pennsylvania.

June 12, 1975.

Donald L. Very, Tucker, Arensberg & Ferguson, Pittsburgh, Pa., for plaintiffs.

Michael L. Magulic, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

Callioppi Evangelinos and her children, Constantine, Erma, Stella, and Mary Julia (Plaintiffs) purchased round trip air transportation reservations from Trans World Airlines, Inc., (TWA) from Pittsburgh, Pennsylvania through New York City to Athens, Greece, and return. While the Plaintiffs were awaiting to board return TWA Flight 881 [1] in Athens in the boarding area, the peace and quiet of the scene was broken by a terrorist attack when two armed men threw hand grenades, followed by gunshots fired at random into the crowd. Then the attackers took up a position behind a bar in the Transit Lounge and held thirty-two people as hostages. At approximately 5:20 P.M., after nearly two hours of negotiation with local officials, the terrorists surrendered and were arrested. The toll that afternoon included forty TWA passengers wounded; two TWA passengers died immediately and a third several days later; a passenger of another airline died immediately; four TWA employees were injured; and an undetermined number of passengers and employees of other airlines were wounded. The Plaintiffs herein were severely wounded by shrapnel or bullets.

Suit was brought against TWA on absolute liability based upon the Warsaw Convention as modified by the Montreal Agreement, and alternatively for negligence.

The Plaintiffs have filed a Motion for Partial Summary Judgment on the issue of absolute liability. Defendant has also moved for Summary Judgment on that issue of liability and opposes Plaintiffs' Motion.[2]

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.[3]

There is no genuine issue with respect to the basic facts which underlie the incident. TWA was engaged in the international air transportation of passengers and personal property between New York City, New York, and Athens, Greece. Both the United States and Greece are signatories to the Warsaw Convention, more formally known as "A Convention for the Unification of Certain Rules Relating to International

---

1. "On August 5, 1973, the security procedures with respect to inspection of passengers and baggage for Flight 881 were administered by the Greek authorities. * * * Two TWA security guards were also present." (Defendant's Answer to Interrogatory No. 19).

2. The cause of action based on negligence is not in issue on the instant Motions for Summary Judgment.

3. 28 U.S.C. § 1331 provides as follows:

"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

Transportation by Air",[4] and TWA is signatory to the Montreal Agreement,[5] more particularly discussed hereinafter.

On August 5, 1973, the Plaintiffs were driven to the Athens Airport by a relative and arrived at about 2:00 P.M. They reported to the check-in counter in the departure hall on the upper level, where their luggage was checked, ticket coupons were submitted and boarding passes were issued by TWA employees. They then proceeded to an area on the same level where their boarding passes and tickets [6] were checked and examined by the police and then they reported to passport and currency control where their passports were examined and stamped. They then proceeded down a set of stairs into the Transit Lounge on the lower level, entrance to which is restricted to passengers ticketed and scheduled to depart on international flights of the forty scheduled carriers operating out of the terminal and to other personnel, who are not passengers, needed to service the area. Gates 4 and 5 were normally used by TWA for their outgoing flights. The Transit Lounge was not partitioned into exclusive areas. The Plaintiffs went to the Transfer Desk in the Transit Lounge area where they obtained a seat assignment and then awaited the announcement of the boarding of their flight in order to report to Gate 4. At this Gate, there are two separate lines, one for males and one for females, where there is a handbag search and a physical search made by the Greek Police. There are tables for examination of hand luggage and behind the tables were located two booths for physical search of all persons intending to depart. After the search, passengers would proceed through double doors out of the Transit Lounge where they boarded buses for transportation to the aircraft stationed at some distance from Gate 4.

The Transfer Desk (where the seat assignments were handed out) was manned by TWA personnel, as well as employees of the other airlines that used the terminal. Two TWA Security Guards were stationed at Gate 4 as well as at least two passenger service personnel of TWA. After being physically searched, the passengers would have walked to two sets of exit doors which led from the Transit Lounge to a raised terrace attached to the terminal building. Two sets of stairs were located on the east side of the terrace leading to a waiting area where there was a bus operated by Olympic Airlines and intended to carry persons across the traffic apron a distance of approximately 250 meters to where the airplanes were parked for loading.

At the time of the attack, all eighty-nine passengers scheduled to board TWA Flight 881 had checked in and received their boarding passes. The Plaintiffs had completed the various steps required and began to queue up in two lines preparatory to proceeding through the hand baggage and physical searches. At the same time, there was being prepared, Flight 806 destined for Tel Aviv, and the Tel Aviv passengers were taken out of the Gate 4 lineup (the electrically controlled sign having erroneously shown Flight 806–Tel Aviv instead of Flight

---

4. For a thorough review of the Convention see the excellent discussion by Judge Wisdom in *Block v. Compagnie Nationale Air France*, 386 F.2d 323 (5th Cir. 1967), *cert. denied* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

5. Civil Aeronautics Board Agreement 18900, Order Serial No. E–23680, May 13, 1966.

6. The tickets contained the "Advice To International Passengers on Limitation of Lia-bility" and the "Notice" which read in pertinent part as follows: "If the passenger's journey involves an ultimate destination or stop in a country other than the country of departure the Warsaw Convention may be applicable and the Convention governs and in most cases limits the liability of carriers for death or personal injury and in respect of loss of or damage to baggage. . . . "

881–New York).[7] These passengers were then taken through Gate 5 where Swiss Air had just completed boarding of another flight.

Approximately seven Flight 881 passengers had departed through Gate 4, exited the Transit Lounge, and had either boarded or were about to board the bus previously referred to. The great majority of the eighty-nine scheduled passengers for Flight 881 were in line in front of the tables at Gate 4 at the time of the incident. The Plaintiffs were injured while being queued up in line in front of Gate 4 while waiting to be searched.

In statements made later to the police, the terrorists admitted that they had planned to attack "Israel immigrant passengers on TWA Flights going to Tel Aviv, but by mistake struck when the passengers were actually boarding the New York bound flight." They acknowledged membership in a Black September Terrorist Organization and were seeking international publicity.

The flight finally departed for New York carrying only the seven passengers who had completed clearance before the incident and were available when the local police released the aircraft at 5:30 P.M. Athens time.

## THE WARSAW CONVENTION

### (49 Stat. 3000, 49 U.S.C. § 1502 (Note))

In 1934, the United States became a party to the Warsaw Convention, a treaty subsequently signed by one hundred and seven nations, applying to "all international transportation of persons . . . performed by aircraft for hire. . ."[8] (Article 1(1)).

█ It is clear that the overall objective of the Warsaw Convention was to

---

7. "At approximately 2:55 P.M., Athens local time, the boarding of TWA Flight 840, a flight through Athens to Tel Aviv had been completed with 121 passengers joining the flight at Athens and 21 through passengers on board. Due to the late arrival of the inbound aircraft, Flight 840 was in a multiple landing operation with Flight 806, another TWA flight through Athens to Tel Aviv, and also with the originating flight 881, a flight originating in Athens to New York. All three vehicles were parked on the traffic apron as shown at no. 19, Diagram A to the Enright Report.

15 passengers were then boarded on Flight 806 including a party of ten connecting passengers originally booked on Flight 840 who had arrived late and were being protected on Flight 806, that is, placed on a substitute flight going to the same destination. At approximately 3:00 P.M., a TWA ground hostess made an announcement over the loud speaker system that all persons awaiting Flight 881 were to proceed to Gate 4 which was located as shown on Exhibit B to the Stipulation. After this announcement, passengers, including plaintiffs, scheduled to board Flight 881 began to queue up in two lines, preparatory to proceeding through hand baggage and physical search. Upon hearing this announcement, Greek Airport personnel in another part of the building electronically changed the sign board over Gate 4 from 'TWA Flight 806 Tel Aviv' to 'TWA Flight 881–New York'. At that point, Marina Mastroyanni, a TWA customer service agent, who had been told that there were two transit passengers missing from Flight 806, bound for Tel Aviv, came to the transfer desk and made the announcement over the loud speaking system, 'immediate boarding of TWA Flight 806 to Tel Aviv at Gate 4.' Upon hearing this announcement, the airport personnel changed the sign over Gate 4 to read 'TWA Flight 806–Tel Aviv.' Miss Mastroyanni indicated at the time she made this announcement that she was missing two transit passengers from Flight 806 who had deplaned, apparently to go to the duty free shop. After making the announcement at the transit desk, Miss Mastroyanni returned to Gate 4 and asked the passengers who had been queued up there for Flight 881 if any of them were Tel Aviv passengers. She took three passengers out of line who were bound for Tel Aviv and took them to Gate 5 where Swiss Air had just completed boarding of a flight and she checked these Flight 806 passengers through Gate 5." (Memorandum of Plaintiffs in Support of Motion for Partial Summary Judgment, pp. 7 and 8).

8. The Warsaw Convention was signed by the representatives of 23 countries at Warsaw, Poland on October 12, 1929, and on October 29, 1934 President Roosevelt proclaimed adherence after the United States Senate had advised adherence on June 15, 1934.

provide uniform rules relating to air transportation documents such as tickets, baggage checks and air way bills, and to limit the air carrier's liability for an airplane accident. Article 17 of the Convention provides:

> "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or *in the course of any of the operations of embarking or disembarking.*" (Emphasis supplied).

Article 22 of the Warsaw Convention limited damages to the maximum amount of $8,300 per passenger, thus limiting the amount of recovery that an injured or wounded passenger could secure on an international flight.

On November 15, 1965, the United States formally denounced the Warsaw Convention because of its dissatisfaction with the damage limitation of $8,300, feeling this was unduly prejudicial to American citizens travelling abroad on international flights.[9] Cancellation of United States' participation was to take effect May 15, 1966, but one day before that time the United States withdrew its notice of cancellation as a result of numerous meetings which resulted in an increased limit of liability and was known as the Montreal Agreement. This Agreement between the air carriers, which was signed by TWA and approved by various governmental bodies, including the United States through its Civil Aeronautics Board,[10] provides:

> "(1) The limit of liability for each passenger for death, wounding or other bodily injuries shall be the sum of U. S. $75,000 . . ."
>
> "(2) The carrier shall not . . . avail itself of any defense under Article 20(1) . . ."

Previous Article 20(1) had provided that a carrier could have a defense that it:

> ". . . ha[d] taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."

Thus, the Montreal Agreement, as here applicable, waived limitations in the Warsaw Convention and agreed to the increased liability of $75,000 for each passenger, waived the defense it might have under Article 20(1) and accepted absolute liability, provided the transportation was international in scope and involved a location within the United States. (See 32 *Journal of Air Law and Commerce* 243 (1966)). Clearly, the Montreal Agreement imposed liability on carriers for damages caused under circumstances beyond their control such as sabotage and hijacking. See 80 *Harvard Law Review* 497, 560 (1967) and *Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. 702 (S.D.N.Y.1972), *aff'd,* 485 F.2d 1240 (2d Cir. 1973).

## DISCUSSION

Defendant TWA contends that the Warsaw Convention does not apply for the Plaintiffs here because they were not injured while "on board the aircraft or in the course of any of the operations of embarking or disembarking", because they were inside the terminal building.

The precise meaning of the terms of any statute or treaty is a question of law. *Todok v. Union State Bank,* 281 U.S. 449, 50 S.Ct. 363, 74 L.Ed. 956 (1930); *McDonald v. Air Canada,* 439 F.2d 1401 (1st Cir. 1971); *Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 392, 358 N.Y.S.2d 97, 314 N.E.2d 848 (1974). The scope or substance of the carrier's liability under the treaty must be determined from an examination of the "four corners of the treaty" *(American Trust Company v. Smyth,*

---

9. Department of State Press Release No. 268, November 15, 1965; See New York Times, November 16, 1965 (City Edition), p. 82, column 1.

10. Approved by the Civil Aeronautics Board, May 13, 1966, Order E–23680, 31 Fed.Reg. 7302 (1966).

247 F.2d 149, 153 (9th Cir. 1957)), keeping in mind the purpose of the contracting parties. *Noel v. Linea Aeropostal Venezolana*, 247 F.2d 677, 679 (2d Cir. 1957); *Rosman v. Trans World Airlines, Inc., supra. Cf. United States v. Belmont*, 301 U.S. 324, 331–332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937).

This is further brought out by Article 23 of the Warsaw Convention which states:

> "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and void, but the nullity of any such provision shall not involve the nullity of the whole contract, which shall remain subject to the provisions of this convention."

■ It is not helpful to look at whether or not the airline would have been liable at common law for injuries or accidents occurring under the circumstances here, as contended for by the Plaintiffs. To the contrary, we look to the Convention. As stated by both parties, the Montreal Agreement did not and could not change the terms of the Convention. The latter agreement among several airlines raised the liability limit in accordance with Article 22 (1) of the Convention and waived the defense of due care as provided for in Article 20(1). *Rosman v. Trans World Airlines, Inc., supra; McDonald v. Air Canada, supra.* Nor was there any attempt by the Montreal Agreement to limit the application of "an accident" as defined in Article 17 of the Convention to exclude the criminal act of a third party. *See Husserl v. Swiss Air Transport, supra.*

■ It is the well established practice of the courts in this country to look to the legislative history of a treaty. *Choctaw Nation v. United States*, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933); *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933).

And specifically with respect to the Warsaw Convention, a federal court has stated "the determination in an American court of the meaning of an international convention drawn by continental jurists is hardly possible without considering the conception, parturition, and growth of the convention." *Block v. Compagnie Nationale Air France, supra*, 386 F.2d at p. 336.

As we do so, we note that in the working draft that was before the delegates as they met in Warsaw in October of 1929, it was provided:

> "The period of carriage for the application of the provisions of the present chapter, extend from the time when the passengers, goods or baggage enter the airport of departure until the time when they exit from the airport of arrival; it does not cover any carriage whatsoever outside the limits of an airport, other than by aircraft". (Translation from the French; Michael Riffaterre, Professor and Chairman of the Department of French and Romance Philology at Columbia University; Article 20, Paragraph 1 of the Comite International Technique d'Experts Juridiques Aeriens).

Apparently, the delegates had little trouble agreeing that liability should attach inside the terminal building in the case of goods and baggage, but there was extensive debate on that principle as regards passengers. *Rosman v. Trans World Airlines, Inc., supra.* The New York State Court of Appeals noted that "[t]he minutes of the Convention indicate that the debate over this article [17] centered around the issue of when the air carrier's liability for damage to passengers should begin and end rather than the scope of compensable injuries." *Rosman v. Trans World Airlines, Inc.*, 34 N.Y.2d 385, 395 n. 10, 358 N.Y.S.2d 97, 105 n. 10, 314 N.E.2d 848, 854 n. 10 (1974). When the Draft Article was voted upon, it was rejected by the delegates. (Warsaw Minutes at p. 57). The Article was then sent back to the drafting committee and apparently at the sug-

gestion of the French delegate, Mr. Ripert, Draft Article 20 was split into two separate articles; Article 17 for passengers and Article 18 for goods and baggage. (Warsaw Minutes at p. 136).

Article 18, relating to goods and baggage, contained the basic system originally provided for in Draft Article 20; it provided for liability "if the occurrence which caused the damage so sustained took place during the transportation by air." "Transportation by air" was defined as comprising "the period during which the baggage and goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of landing outside an airport, in any place whatsoever."

Article 17, as we have seen, related only to passengers and covered the damages, "if the accident which caused the damage so sustained took place on board the aircraft or *in the course of any of the operations of embarking or disembarking.*" (Emphasis added).

Amadeo Giannini, the Italian Delegate to the Conference, later wrote, concerning the change in language, that "in this way, the grave and unjustifiable rule proposed by C.I.T.E.J.A.[11] to have liability commence at the moment of entry into or exit from, respectively, the airport of departure or arrival, is eliminated." (Translation from the Italian; Giannini, *Saggi di Diritto Aeronautico,* p. 233 (1932)).

At the Fifth International Conference on Air Navigation held at The Hague in 1930, D. Goedhuis (later President of The Hague Convention) presented a paper in which he stated:

". . . [A]rt. 17 mentions 'embarquement' and 'debarquement'. The question is how to explain these words? There are two views *viz:* a) in a broad sense: *i. e.* the embarking begins when the passenger leaves the station-building on his way to the aeroplane, standing in the flying-field; the disembarking ends when the passenger, arrived at destination, enters the station-building; b) in a narrow sense, *i. e.*: the getting on board and the alightment only comprise the actual getting in and out of the aeroplane."

Mr. Goedhuis, during the discussion which followed, stated that he favored "a broad interpretation . . . to cover passengers going from the terminal building to the plane and vice versa." Others, including Dr. W. Muller, President of the Congress Legal Section and the Dutch Delegate to the Warsaw Conference, supported a narrow view which covered the time when the passengers were actually boarding the aircraft. (Fifth Congress, at p. 1173).

From these discussions it is apparent to the Court that the delegates were defining geographical limits rather than an activity when they used the words, "any operations of embarkation". In any event, even under the broadest of the two positions outlined by Mr. Goedhuis, the Plaintiffs in this case were not within the "operations of embarkation".

We are confronted immediately with Judge Brieant's decision in *Day v. Trans World Airlines, Inc.,* 393 F.Supp. 217 (S.D.N.Y.1975), in an opinion entered March 31, 1975 in which he allowed recovery in suits involving two survivors and one decedent from this same incident who were in the same waiting line to board Flight 881. He very incisively sets forth his interpretation of the "operations of embarkation" as follows (at p. 221):

"A consideration of the plain meaning of the words 'in the course of any of the operations of embarking' produces a single conclusion. These passengers could not board the aircraft unless they:

1. presented their tickets to TWA at the checking desk on the upper level;

2. obtained boarding passes from TWA;

11. Comite International Technique d'Experts Juridiques Aeriens.

3. obtained baggage checks from TWA;

4. obtained an assigned seat number from TWA;

5. passed through passport and currency control imposed by the Greek Government;

6. submitted to a search of their persons for explosives and weapons by Greek police;

7. submitted their carry-on baggage for similar inspection by Greek police;

8. walked through Gate 4 to Olympic's bus;

9. boarded the bus;

10. rode in the bus a distance of 100 yards; and

11. walked off the bus and onto the aircraft.

There is simply no other way to 'embark,' except by these eleven steps. None of these pursuits above-named were being conducted for the personal convenience of the passengers, nor did any of them constitute frolic and detour. When they were injured they had completed five out of eleven steps, each absolutely essential. Without any one, a passenger could not 'embark' upon the aircraft.

Of course, when the Convention was drafted, we lived in a simpler day. Many airlines required nothing more than to weigh the passenger and his luggage, take his ticket and allow him to place his foot on the boarding ladder. The plain meaning of the treaty must be adaptable to the practical exigencies of air travel in these parlous times. Regardless of whose real estate he was standing on at the time of the terrorist attack, under the circumstances of this case, any person who had accomplished as many as five out of the above mentioned eleven essential acts without which it would be impossible to travel on the flight, within an uninterrupted time sequence, and was perforce lined up to perform the balance of the required acts se-

quentially, is within the plain meaning of the clause above quoted. TWA would have refused to carry any passenger until he completed substantially all of the above-enumerated acts in the order listed."

The great difficulty with Judge Brieant's opinion, as this Court views the matter, is that it extends the liability of the signatories to the Montreal Agreement under the Warsaw Convention far beyond anything that was within the contemplation of the parties. This, the Court does not feel justified in doing.

The Defendant has cited in support of its position here, the same cases that were cited to Judge Brieant and which Judge Brieant primarily distinguished on the basis that they involved disembarkation. *McDonald v. Air Canada, supra; Felismina v. Trans World Airlines, Inc.,* 13 Aviation Law Reporter 17–145 (S.D.N.Y.1974); *Klein v. KLM Royal Dutch Airlines,* 46 A.D.2d 679, 360 N.Y.S.2d 60 (2d Dept. 1974), New York Legal Journal, October 23, 1974 at p. 21, col. 4; *Mache v. Air France,* [1967] Revue Francaise de Droit Aerien 343, 345 (Cour d'Appel de Rouen 1967); *aff'd* [1970]. It will be noted, however, that many of the steps involved in embarkation, as outlined by Judge Brieant in *Day,* are just as essential, although in reverse, to the steps one must take in disembarking. Thus, it is obvious that in disembarking from the plane, passengers must either come down the steps from the plane or go on the jetway to the terminal building. They may then, as was the situation in the instant case, be required to board a bus, but in any event, they would then enter the terminal building and be subjected to inspection by the government of entry. At this point, we believe, they must be deemed to be beyond the scope of the carrier's liability.

In *McDonald, supra,* a disembarking passenger had left the airplane, left the carrier's area and had arrived in the common terminal baggage area. Subsequently, she was found on the floor, but

no testimony was presented to describe the cause of her fall. The First Circuit found the airline was not liable because negligence had not been proven, nor was an "accident" proven, but rather a fall from some internal condition. By way of *dicta*, the Court stated it would seem that a passenger could not recover for events occurring after he "has reached a safe point inside of the terminal, even though he may remain in the status of a passenger of the carrier while inside the building." (Emphasis added). The Court went on to say, "without determining where the exact line occurs, it had been crossed in the case at bar." (439 F.2d at p. 1405). The rationale of the Court had to do with the operation of disembarking (activity) as being terminated by the time the passenger descended from the plane and reached a safe point inside the terminal, "far removed from the operation of the aircraft"; not just that she had reached the terminal building.

In *Felismina, supra,* plaintiff was disembarking and had walked through an expandable horizontal jetway which led from the airplane door to the "terminal proper", and walked through the long approach ramps at Kennedy Airport into a small room on the upper floor of the terminal. She was injured as she stepped onto the down escalator leading to the lower level of the terminal where health, immigration, baggage claim, and customs were situated. TWA attempted to apply the Convention to that situation because of a shorter statute of limitations. The Court found that the Warsaw Convention did not apply as, "that by the time plaintiff boarded the down escalator, she had disembarked from defendant's aircraft." It was clear that Felismina was not in the act of disembarking, since she had entered on the down escalator leading to the lower level where the baggage claim and customs were situated. She was well beyond the scope of disembarkation.

In *Klein, supra,* again the plaintiffs had gotten off the aircraft and had arrived safely within the terminal building at Lod Airport, Israel. The Court simply held that they had disembarked "within the meaning of Article 17 of the Warsaw Convention." (*Cf.* McDonald v. Air Canada, *supra.*)

In *Mache, supra,* the plaintiff was led by two stewardesses across the traffic apron from the plane toward the terminal building. Because of construction work, he had to take a shortcut through the customs garden which was not on the traffic apron proper but off to the side and outside of the terminal building. While crossing the customs garden, which while not part of the traffic apron was on the same level, plaintiff sustained an accident. The Court held that the Warsaw Convention did not apply; as disembarking had been accomplished: "it is only to the extent that these operations are taking place on the traffic apron" that the Convention would apply.

█ Here as well, we believe, when the passengers were waiting in line to proceed to the last gate of the terminal, they were not within the "operations of embarkation", and that as a matter of law, the Plaintiffs' injuries in the matter *sub judice* were not incurred as a result of an accident actionable under the Warsaw Convention as supplemented by the Montreal Agreement.

The Plaintiffs' Motion for Summary Judgment on the issue of liability is denied; Defendant's Motion for Summary Judgment dismissing the claim is granted.

This Court recognizes that the issue of liability is one of first impression as far as our Circuit and the Supreme Court of the United States are concerned. An immediate appeal from the Order to be entered herein can materially advance the termination of this case and will be granted if so requested.

An appropriate Order will be entered.