Constantine **EVANGELINOS** et al., Appellants,

v.

**TRANS WORLD AIRLINES, INCORPORATED.**

No. 75–1990.

United States Court of Appeals, Third Circuit.

Argued Feb. 3, 1976.

Reheard Before the Court En Banc Nov. 4, 1976.

Decided Feb. 4, 1977.

Donald L. Very, Tucker, Arensberg & Ferguson, Pittsburgh, Pa., for appellants.

Michael L. Magulick and Robert E. Wayman, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for appellee; John N. Romans, P. G. Pennoyer, Jr., Charles K. O'Neill and Hilton H. Stothers, Jr., Chadbourne, Parke, Whiteside & Wolff, New York City, of counsel.

Argued Feb. 3, 1976.

Before SEITZ, Chief Judge, and VAN DUSEN and WEIS, Circuit Judges.

Reargued En Banc Nov. 4, 1976.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

On August 5, 1973, the Transit Lounge of the Hellinkon Airport in Athens, Greece, was the scene of a vicious terrorist attack on the passengers of TWA's New York bound Flight 881. The principal question presented by this interlocutory appeal [1] concerns the liability of Trans World Airlines under the terms of the Warsaw Convention, 49 Stat. 3000, *et seq.* (1934), as modified by the Montreal Agreement of 1966, 31 Fed. Reg. 7302 (1966).[2] The district court concluded that the terms of the Convention were not applicable to the plaintiffs at the time of the terrorist attack and accordingly granted TWA's motion for partial summary judgment, dismissing the claim under the Warsaw Convention.[3] *Evangelinos v. Trans World Airlines*, 396 F.Supp. 95 (W.D. Pa.1975). We reverse and remand.

The facts of the attack on which this litigation is based have been exhaustively summarized elsewhere [4] and need not be repeated here. It is enough to state briefly that, at the time of the attack, plaintiffs had already completed all the steps necessary to boarding the aircraft except (1) undergoing physical and handbag searches,[5] and (2) physically proceeding from the search area to the aircraft some 250 meters away. Immediately after Flight 881 was announced over the Transit Lounge loudspeaker, the passengers were instructed to form two lines in front of Departure Gate 4. And, while all but a handful of passengers were standing in those lines awaiting

---

1. By amended order dated June 26, 1975, the district court certified this appeal pursuant to 28 U.S.C. § 1292(b) (232–33a). On July 21, 1975, we granted plaintiff-appellants' petition for permission to appeal. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1332. Plaintiffs are citizens of Ohio. Defendant is incorporated in the State of Delaware and has its principal place of business in New York.

2. Both the Convention, a treaty officially entitled "A Convention for the Unification of Certain Rules Relating To International Transportation by Air," and the Montreal Agreement are reprinted at 49 U.S.C. § 1502 note (1970).

3. The complaint alleged both absolute liability under the Warsaw Convention, as modified, and negligence.

4. *Evangelinos v. Trans World Airlines, Inc.,* supra at 96–98, and *Day v. Trans World Airlines,* 528 F.2d 31 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

5. These searches were required and conducted by the Greek Government and were prerequisites of being permitted to leave the airport by plane. TWA had two guards stationed inside the terminal building immediately beyond the search procedure area.

the search procedure,[6] two terrorists fired bursts of automatic weapons fire in the general direction of the TWA queues and hurled hand grenades, which exploded in the vicinity of the passengers.

Under the terms of the Warsaw Convention, as modified, TWA is absolutely liable up to a limit of $75,000. per passenger if an incident which causes passenger injury or death falls within the ambit of Article 17 of the Convention.[7] Article 17 provides:

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger if the accident which caused the damage so

sustained took place on board the aircraft *or in the course of any of the operations of embarking or disembarking.*" (Emphasis added.)

TWA does not dispute the district court's conclusion that a terrorist attack on airline passengers is an "accident" within the meaning of Article 17. Thus the central question is whether the attack took place "in the course of any of the operations of embarking. . . ."

■ Our task has been significantly facilitated by the Second Circuit's recent decision in *Day v. Trans World Airlines*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), an

---

**6.** The district court stated that:
". . . entrance to [the Transit Lounge] is restricted to passengers ticketed and scheduled to depart on international flights of the . . . carriers operating out of the terminal and to other personnel, who are not passengers, needed to service the area. . . . At . . . Gate [4], there are two separate lines, one for males and one for females, where there is a handbag search and a physical search made by the Greek Police. There are tables for examination of hand luggage and behind the tables were located two booths for physical search of all persons intending to depart. After the search, passengers would proceed through double doors out of the Transit Lounge where they boarded buses for transportation to the aircraft stationed at some distance from Gate 4.

". . . Two TWA Security Guards were stationed at Gate 4 as well as at least two passenger service personnel of TWA. After being physically searched, the passengers would have walked to two sets of exit doors which led from the Transit Lounge to a raised terrace attached to the terminal building. Two sets of stairs were located on the east side of the terrace leading to a waiting area where there was a bus . . . intended to carry persons across the traffic apron a distance of approximately 250 meters to where the airplanes were parked for loading.

"At the time of the attack, all eighty-nine passengers scheduled to board TWA Flight 881 had checked in and received their boarding passes. The Plaintiffs had completed the various steps required and began to queue up in two lines preparatory to proceeding through the hand baggage and physical searches. . . .

"Approximately seven Flight 881 passengers had departed through Gate 4, exited the Transit Lounge, and had either boarded or were about to board the bus previously re-

ferred to. The great majority of the eighty-nine scheduled passengers for Flight 881 were in line in front of the tables at Gate 4 at the time of the incident. The Plaintiffs were injured while being queued up in line in front of Gate 4 while waiting to be searched." Pages 97–98 of 396 F.Supp. (footnotes omitted).

**7.** As originally conceived and drafted, the Convention effected a bargain in which airline passengers traded a monetary limitation on damages—the equivalent of $8,300. per passenger—for the establishment of a rebuttable presumption of liability on the part of the carrier for "accidents" falling within the ambit of the Convention. Warsaw Convention, Chap. III. American dissatisfaction with this bargain, especially the limits on damages, ultimately led to the Montreal Agreement, a voluntary agreement between air carriers governing international transportation that involved a United States location. Pursuant to the Agreement, each participating airline filed with the Civil Aeronautics Board a contract under which the damages limit was raised to $75,000. and the various carriers agreed not to assert any of the affirmative defenses provided in Article 20 of the Convention. The effect was contractual creation of a new regime of absolute liability for damages arising from incidents falling within the Convention. For excellent discussions of the background of the Warsaw Convention and the Montreal Agreement, see *Block v. Compagnie Nationale Air France*, 386 F.2d 323 (5th Cir. 1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967); Note, Warsaw Convention—Air Carrier Liability For Passenger Injuries Sustained Within A Terminal, 45 Ford.L.Rev. 369 (issue of November 1976).

identical case arising out of the same incident.[8] See also *Leppo v. Trans World Airlines, Inc.*, Misc. (N.Y.Sup.Ct. No. 21770–1973, Trial Term, Part 62, Decision of Mar. 10, 1976, N.Y. County). In the *Day* case, Chief Judge Kaufman, in a thorough and scholarly opinion, carefully analyzed the history and purposes of the Warsaw Convention, as modified. Emphasizing the American experience under the Convention, the current expectation of air carriers governed by the Convention as modified, and the considerations militating in favor of liability in this case, the *Day* court unanimously concluded that the activities of the TWA passengers at the Athens airport fell within the purview of the phrase "the operations of embarking." We agree with the result reached in *Day*, although our reasoning differs slightly, and note that there is a substantial interest in uniformity of decision in this area. *Cf. Block v. Compagnie Nationale Air France*, 386 F.2d 323, 337 (5th Cir. 1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

■ TWA has urged us to devise an easily predictable rule as to when liability attaches. We agree that this is desirable. However enticing as such an approach might be, we cannot accede to the notion that a line can be drawn at a particular point, such as the exit door of an air terminal which leads to the airfield. This is because a test that relies upon location alone is both too arbitrary and too specific to have broad application, since almost every situation and every airport is different. In our view, three factors are primarily relevant to a determination of the question of liability under Article 17: location of the accident, the activity in which the injured person was engaged, and the control by defendant of such injured person at the location and during the activity taking place at the time of the accident alleged to be "in the course of any of the operations of embarking," [8a] may be relevant to the decision under Article 17, and bear significantly upon the tests of activity and location.

■ In so recognizing, we place less weight upon carrier control over passengers than did the *Day* court. While control remains at least equally as important as location and activity, it is an integral factor in evaluating both location and activity. A standard based primarily upon these three factors seems best calculated to effect the policies underlying Article 17.

Giving the phrase "in the course of any of the operations of embarking" a common sense construction, we agree with plaintiffs' contention that we must examine the nature of the activity in which plaintiffs were engaged to determine if that activity can fairly be considered part of "the operations of embarking." Nothing in the Convention

8. In addition to noting the Supreme Court's denial of certiorari in the *Day* case, counsel have furnished us the Memorandum of the United States, as amicus curiae in that case, filed by the Solicitor General with the Supreme Court in September 1976, concluding that the "petition for a writ of certiorari should be denied." That Memorandum includes a detailed analysis of the relevant sections of the Warsaw Convention, and a consideration of *Evangelinos v. Trans World Airlines, Inc.* Opinion of May 4, 1976 (No. 75–1990, 3d Cir.), the panel decision of this court which underlies the instant rehearing in banc, *MacDonald v. Air Canada*, (1st Cir. 1971) (stating at pages 12–13 that *MacDonald* appears consistent with *Day* and the May 4, 1976 panel opinion in this case), and *Maché v. Air France,* Rev. Fr. Dr. Aér. 311 (Cour de Cassation 1970) (concluding that, to the extent the *Maché* case is inconsistent with *Day*, "the view appears to be in the nature of dictum [and] the extent to which it will be adhered to in future cases may be a matter of some doubt").

8a. For example, the fact that the airline exercised strict control of passengers at the time of checking their baggage near the entrance to the airport terminal building might be irrelevant to the location and activity factors where such control was relinquished and only reassumed after entry into the line formed for going through the gate leading to the walkway or passenger bus transportation to the aircraft. Another possibly relevant factor is whether the cause of the accident is a hazard of air travel as it exists at the time of the accident, since the Warsaw Convention was concerned with such hazards. The extensive use of air travel in international transportation of people has made terrorist attacks common in and near major airport terminals, even though they also take place at other locations. See Note, *supra* note 7, at 382–87 (IV C).

defines the term "operations of embarking" or otherwise defines the period of liability prior to entering the aircraft door. Nevertheless, for substantially the same reasons expressed in *Day v. Trans World Airlines, supra,* 528 F.2d at 33–34, we believe it is appropriate under all the facts and circumstances of this case to view the preboarding searches as part of the "operations of embarking."

■ The undisputed facts reveal that, at the time of the attack, the plaintiffs had completed virtually all the activities required as a prerequisite to boarding, and were standing in line at the departure gate ready to proceed to the aircraft. The plaintiffs' injuries were sustained while they were acting at the explicit direction of TWA, and while they were performing the final act required as a prerequisite to boarding busses employed by TWA to take the Evangelinos family to the aircraft. More significantly, at the time these operations had commenced, Flight 881 had already been called for final boarding. As a result, TWA passengers were no longer mingling over a broad area with passengers of other airlines. Instead, acting pursuant to instructions, they were congregated in a specific geographical area designated by TWA and were identifiable as a group associated with Flight 881.

By announcing the flight, forming the group and directing the passengers as a group to stand near the departure gate, TWA had assumed control over the group and caused them to congregate in an area and formation directly and solely related to embarkation on Flight 881. This conclusion is supported by the fact that TWA service personnel were standing at Gate 4, guiding the passengers, and TWA security personnel were present. Under these circumstances, it is reasonable to conclude that TWA had begun to perform its obligation as air carrier under the contract of carriage and that TWA, by announcing the flight and taking control of the passengers as a group, had assumed responsibility for the plaintiffs' protection. Thus, for all practical purposes, "the operations of embarking" had begun. This conclusion is supported by *Blumenfeld v. Bea,* 1962 Z. Luft. R. 78 (Berlin Court of Appeals 1961), a case which would allow coverage under the facts present here.[9]

Neither *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1971), nor the French case of *Maché v. Air France,* Rev. Fr. Dr. Aér. 343 (Cour d'Appel de Rouen 1967), aff'd. Rev. Fr. Dr. Aér. 311 (Cour de Cassation 1970) (reprinted in translation as Exhibit B to appellee's brief), is inconsistent with the conclusion that "the operations of embarking" had commenced at the time of the accident in this case. First, both cases involved disembarking, where the nature and extent of the carrier's control over the passenger and the type of activity in which plaintiff was engaged differed significantly from the case at bar.[10] Further, both the *MacDonald* and *Maché* courts considered the Conven-

---

9. In *Blumenfeld,* the plaintiff fell and broke her leg and ankle on the stairs leading from the waiting room for departing passengers to the traffic apron. The Berlin Court of Appeals, in interpreting Article 17, stated that "the air carrier takes charge of the flight passengers when he requests them to go from the waiting room to the aircraft. Already at that time the air carrier begins to carry out the transportation contract, the essential accessory obligation of which consists in providing for the safety of passengers in every respect and in securing the traffic which was begun." (Translation agreed upon by counsel for all parties.)

10. The recent case of *Hernandez v. Air France,* 545 F.2d 279, No. 76–1146 (1st Cir. 1976), makes clear that the First Circuit's earlier decision in *MacDonald* is not in conflict with the conclusion which we reach here. In *MacDonald,* the plaintiff was injured while she was waiting for her baggage in the baggage claim area of Boston International Airport. She was in no sense under the control of the airline or acting as a part of a group under direct airline supervision. *In Re Tel Aviv,* 405 F.Supp. 154 (D.P.R., 1975), aff'd sub nom., *Hernandez et al. v. Air France,* 545 F.2d 279, No. 76–1146 (1st Cir. 1976), a disembarkation case arising in the same Circuit as *MacDonald,* nevertheless apparently subscribes to the *Day –Evangelinos* tripartite (location, activity and control) test, but held that the plaintiff (in *Hernandez*) even under that test could not recover. In affirming the district court, the First Circuit endorsed and applied this tripartite test, saying:

"We do not view our holding in *MacDonald* as necessarily foreclosing the adoption of the

tion's original goal of developing rules to govern the risks then thought to be inherent in air carriage and concluded, on that basis, that the Convention did not apply because the plaintiffs had reached "safe" points, distant from such risks. *MacDonald v. Air Canada, supra* at 1405; *Maché v. Air France, supra.* See also Sullivan, The Codification of Air Carrier Liability by International Convention, 7 Journal of Air Law 1, 20 (1936). Since the danger of violence— whether in the form of terrorism, hijacking or sabotage—is today so closely associated with air transportation, the tripartite test we adopt here is more realistic in determining a "safe place" removed from air transportation risks. Here, applying that test, we conclude that the plaintiffs were not located in a "safe place," removed from risks now inherent in air transportation.[10a] To reach any other result would be to freeze the Warsaw Convention in its 1929 mold, when air travel was in its infancy, and to ignore current air travel procedures and the special risks created by the type of violence that resulted in this tragedy.

Nor are we convinced by TWA's principal argument that "the operations of embarking" can never occur within the physical confines of an air terminal building and that the Warsaw Convention is, therefore, inapplicable. Starting, as we must, with the actual language used in Article 17, we are struck by the fact that nothing in Article 17 suggests a limitation on the period of liability based strictly on the location of the "operations of embarking or disembarking." To the contrary, the contrast between the phrase "while on board the aircraft" and the phrase "in the course of any of the operations of embarking . . ." indicates that the draftsmen of Article 17 made a conscious choice to go beyond a mere location test. Further, adoption of the strict location test advanced by TWA could lead to differing results resting solely on the fortuity of where passengers are placed at the time of injury. In the absence of plain language compelling such a conclusion, we reject it.

Recognizing that nothing on the face of Article 17 supports its argument, TWA directs our attention to the treaty making history of that Article. The pertinent history consists of debates that centered around Article 20 of the draft Convention prepared by a small committee of experts, Comité Internationale Technique d'Experts Juridique Aeriens (CITEJA), for consideration at Warsaw. Article 20 of the CITEJA draft provided in part:

"The period of carriage, for the application of the provisions of the present chapter [Liability of the Carrier] shall extend from the moment when the travelers . . . enter the aerodrome of departure, up to the moment when they leave the aerodrome of destination . . . ."

When the draft Article 20 came up for consideration, it provoked considerable debate between those who endorsed the expansive aerodrome-to-aerodrome period of liability and those who espoused a more restrictive view. Minutes, Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw, 67–84

---

*Day–Evangelinos* tripartite test, and we believe that the nature of a plaintiff's activity when injured, its location, and the extent to which the airline was exercising control over plaintiff at the time of injury are certainly relevant considerations in determining the applicability of article 17. On the facts of this case, however, the application of these criteria require the conclusion that plaintiffs did not have the right to recover under article 17."
*Hernandez, supra,* at 282.

Also we note that plaintiff in *Maché* was arguing against the applicability of the Warsaw Convention and that the court in *MacDonald*

held that the plaintiff's injuries in that case were not caused by an "accident" within the meaning of Article 17.

10a. *In Re Tel Aviv, supra,* which is cited in note 10, *supra,* indicates that these dangers of terrorism are continuing. Terrorist attacks occur where there are concentrations of people in order to secure maximum publicity and, therefore, are common in international airports, due to the large volume of international air travel. The large international airport terminals of 1973 did not exist either in 1929, when the Warsaw Convention was adopted, or in 1934, when the United States adhered to that Convention.

(R. Horner & D. Legrez transl. 1975) (hereinafter Minutes). Ultimately the principle of aerodrome-to-aerodrome liability was put to a vote and defeated. Minutes at 82–83. The problem of drafting a new article in conformity with the vote was then referred to a drafting committee and Article 17 in its present form emerged.

TWA contends that the rejection of the CITEJA draft demonstrates that the delegates intended to exclude from the period of liability the time during which passengers are inside air terminal buildings. We disagree. While the rejection of the CITEJA draft indisputably reflected an intent to restrict the expansive period of liability envisioned by Article 20, nothing in the debates indicates that the line was finally and unalterably drawn at the walls of airline terminal buildings.[11] Surely if such an explicit line had been intended, the language of Article 17 would now reflect it. Moreover, the debates indicate confusion among the delegates themselves as to the meaning of the rejection of the CITEJA draft. Minutes at 83–84.[12] We are, therefore, especially reluctant to draw conclusions which are not reflected in the work of a drafting committee that had the advantage of considering the debates contemporaneously.

11. In 1929, the word "aerodrome" meant the entire airfield property on which there were several buildings used by passengers, as opposed to the single, large, air terminal building characteristic of major airports in this country today.

12. We do not find the debates as clear as the dissent indicates. Although the delegates agreed that "rejection of [Draft Article 20] led to acceptance of the opposite principle," it is unclear as to what that "opposite principle" was. In Day, supra, the Second Circuit concluded that the Convention had adopted the views of Prof. Georges Ripert of France—the "dean of French writers on civil law"—who "proposed that the article be recast in terms broad enough to allow the courts to take into account the facts of each case." 528 F.2d at 34–35. In any event, it is clear from the final language of Article 17 that the strict Brazilian proposal, as articulated by the delegate from Great Britain, which would have limited the period of liability to the time when passengers were "on board the aircraft," was not adopted.

The most that can be said is that the draftsmen rejected the concept of automatic liability (subject, of course, to the defenses provided elsewhere in the Convention) for all accidents within the limits of the departing or arrival aerodromes. Our conclusion that under certain circumstances there may be liability for some accidents within a terminal building is not inconsistent with that intent.[13]

Accordingly, the June 26, 1975, judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.

SEITZ, Chief Judge, dissenting with whom ALDISERT and GIBBONS, Circuit Judges, join.

The basic issue here is one of treaty interpretation, to which a provincial approach is presumably inappropriate.

The majority holds that the defendant airline is strictly liable under Article 17 of the Warsaw Convention for the injuries which plaintiffs sustained within an airport terminal while waiting to board their flight, since those injuries occurred "in the course of . . . the operations of embarking." I believe the majority's interpretation of

13. In analyzing this case, as we have, in light of location and activity as well as the carrier's control over the passengers and the likelihood of injury by a cause inherent in air transportation, we have accommodated the concerns of those who opposed the CITEJA draft without doing violence to the language of Article 17. Cf. Shawcross & Beaumont, Air Law, at 441–42 (3d ed. 1966); Matte, Traité de Droit Aerien Aeronautique, at 404–05 (1964); Sullivan, supra.

The debates indicate that the principal fear was that carriers would be liable for injuries sustained by passengers at times when the airline had no control over what the passengers were doing. As Prof. Georges Ripert of France stated:

"There is real difficulty only for travellers, and this difficulty arises from the fact that the traveller has his independence . . . ."
Minutes at 73.

Virtually all delegates agreed that there should be liability while the passengers were onboard the aircraft—a period when the carrier has complete control over both the passengers and their environment.

Article 17 is unsupported by the relevant history of the treaty and is contrary to the views of several signatory countries.

The starting point of my analysis is the policy underlying the enactment of the Warsaw Convention. As originally adopted, the Convention was designed to shield the infant airline industry from potentially crippling damage awards for injuries caused by risks inherent in air transportation. In order to accomplish this objective, the treaty restricted an airline's potential liability to approximately $8,300, in exchange for a presumption that the airline was liable if the accident took place on board the aircraft or during embarkation.

Plaintiffs maintain that the signing of the Montreal Agreement in 1966 marked the rejection of the Convention's original goal and that the Convention, as modified by the Montreal Agreement, is now intended to afford protection solely to the passenger. While it is true that the Montreal Agreement increased the damage limitation to $75,000 and established a system of liability without fault,[1] the Agreement retained in toto the other provisions of the Convention, including Article 17. Thus, while the potential recovery of those previously covered by the Convention was significantly increased, the class of passengers entitled to the treaty's protection and the types of accidents on which liability could be based remained the same. I therefore believe that the Convention's original policy of limiting an airline's liability for personal injuries caused by the unique perils of air navigation retains its vitality, notwithstanding the adoption of the Montreal Agreement. While I am not unmindful of the strong interest in providing injured passengers with an adequate recovery, where their injuries are otherwise within the coverage of the Convention, I believe this goal has been accomplished through the increase of damage limitations and the elimination of the airline's "due care" defense.

The historical concern of the Convention drafters and delegates was with the unusual and grave risks which were then inherent in air travel. With this principle in mind, it is apparent that a passenger's location has a significant impact on the risks to which he is exposed. The farther a passenger is removed from the immediate vicinity of the airplane itself, the less likely it is that he will be injured by any of the unique perils which accompany air travel.

Certain dangers, such as the danger of skyjacking, are encountered once the passenger has boarded the aircraft. Obviously, the threat of skyjacking is not a substantial risk borne by passengers within the terminal. Hence, while skyjacking has been loosely labeled as a risk associated with air travel, *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702 (S.D.N.Y.1972), *aff'd*, 485 F.2d 1240 (2d Cir. 1973), it is evident that such activity creates a risk only to those situated as to be exposed to the danger.

Like skyjacking, sabotage or terrorist activity may pose a threat to passengers boarding or on board an aircraft. To this extent, I agree that terrorism is a risk which accompanies international air travel. I am unable to agree, however, that this particular hazard is an incidental risk of air travel when it occurs within the confines of an airport terminal. Rather, in my view, a terrorist attack inside an airport is no more likely than the bombing of a restaurant, bank or other public place. Accordingly, I believe the majority's conclusion that plaintiffs were injured as a result of a risk inherent in modern air travel is unwarrant-

---

1. It is significant to note that the United States was initially opposed to the principle of absolute liability since it viewed the fault requirement as a necessary protection for the growth of the airline industry. The subsequent retreat from this position occurred when the $100,000 liability limit which the United States advocated was rejected by the other signatories to the treaty. Following the defeat of this proposal, the effective denunciation of the treaty by the United States appeared imminent. The inclusion of a system of liability without fault which was designed to reduce litigation and to provide quicker settlements was therefore suggested as a compromise measure in order to ensure United States acceptance of the lower liability limits. Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv.L. Rev. 497 (1967).

ed. The particular hazards of terrorism which are unique to air navigation are simply not risks to which passengers in plaintiffs' proximity were exposed.

The importance of a passenger's location as it relates to the risks of air travel is underscored by the case law of this country as well as that of other signatories to the treaty.[2] In the French case of *Maché v. Air France,* Rev. Fr. Droit Aerien 343 (Cour d'Appel de Rouen 1967), *aff'd* Rev. Fr. Droit Arien 311 (Cour de Cassation 1970), the highest court in France determined that the Warsaw Convention only governs accidents arising on the ground at locations of the airport where passengers are exposed to aviation risks. In that case a disembarking passenger was led by 2 flight attendants across the traffic apron toward the terminal building. Due to construction work, a detour was taken through a customs area which was not on the traffic apron. The passenger accidently stepped in a man-hole and was injured. In finding that the Warsaw Convention was inapplicable and did not restrict the passenger's potential recovery, the court ruled that the customs area in which plaintiff was injured was not an area exposed to risks of air navigation. Significantly, the court found that the only ground area where such risks were incurred was the traffic apron.

A case decided by the United States Court of Appeals for the First Circuit, *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1971), also stresses the importance of a passenger's location in relation to the hazards of air travel. That case involved a 74 year old woman who mysteriously fell while awaiting her suitcase in the baggage area of an airport. The court affirmed a directed verdict in the defendant airline's favor on the ground that there was no basis for finding an "accident", the first requirement

for invocation of the Convention. In any event, however, the court found that the injuries sustained by plaintiff did not occur during the operation of disembarking since that operation had "terminated by the time the passenger [had] descended from the plane by the use of whatever mechanical means [were] supplied and [had] reached a safe point inside of the terminal . . . ." 439 F.2d at 1405. The court reasoned that the Warsaw Convention was not intended to apply "to accidents which are far removed from the operation of aircraft." *Id.* at 1405.

A determination as to whether a passenger's injuries were sustained in an area exposed to the particular risks of air navigation is thus a necessary first step in deciding whether that passenger was injured during the course of the embarking. Since I believe this threshold determination must be resolved against plaintiffs in this case, I would affirm the judgment of the district court. However, even assuming plaintiffs were injured at a location where the perils of air travel are logically encountered, I do not believe they were injured while in the course of the operations of embarking as required by Article 17. Rather, my reading of the Convention Minutes and the subsequent commentary on the treaty indicates that the delegates viewed the operations of embarking restrictively to include only the actual boarding of the airplane or, at best, the trip across the traffic apron from the terminal building to the plane. Under no circumstances were accidents inside the airport terminal regarded as within the scope of the treaty.

As the majority correctly observes, the present language of Article 17 resulted from the delegates' rejection of Article 20 of the CITEJA draft which would have imposed liability from the time of entry of

---

2. As the majority correctly notes, there is a substantial interest in uniformity of decision in this area. *Block v. Compagnie Nationale Air France,* 386 F.2d 323 (5th Cir. 1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). I do not believe, however, that the interest in uniform *international* interpreta-

tion of the treaty, adverted to in *Block,* compels us to follow the Second Circuit's decision in *Day v. Trans World Airlines,* 528 F.2d 31 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), petition for rehearing pending since that decision is inconsistent with a decision of the highest court in France.

the "aerodrome of departure" until the time of exit from the "aerodrome of arrival." During the debates on Article 20, several amendments were proposed to distinguish between the liability for carriage of passengers and that for transportation of goods. A representative example is the proposal by the delegate from Brazil which suggested that the language of Article 20 be amended:

> "to replace 'from the moment when travelers, goods and baggage enter the aerodrome of departure up to the moment when they leave the aerodrome of destination' by 'from the moment when the travelers have boarded and the goods or baggage have been delivered to the forwarder'."

Minutes at 71.

The French Delegation would have amended Article 20 to limit the airlines' liability for injuries to travelers to those injuries sustained during the course of carriage. During the discussions which followed the various proposals, it became evident that there was considerable dissatisfaction among the delegates with the expansive provision for passenger liability embodied in Article 20 and a widespread feeling that the Article should be re-submitted to the Drafting Committee for revision.

Believing that important questions of substance rather than mere matters of rewording were raised by the several proposed amendments, the delegate from Great Britain suggested that the Convention pass on the substantive issues before referring Article 20 to the Drafting Committee. He remarked as follows:

> "It seems to me that here there are questions of principle upon which one can pass before the referral to the drafting committee.
>
> "For example, as regards travelers, does liability begin, as it is said in the draft, upon the entrance into the aerodrome of departure, or does it begin when the traveler is on board the aircraft? Here is the divergence as it exists as regards the travelers: When must lia-

bility begin? Following the principle established in the draft of the Convention, or simply when the traveler is on board?

> "It's a question upon which I ask that one pass before the referral to the drafting committee."

Minutes at 80–81.

These sentiments were echoes by the Reporter for the preliminary draft who stated:

> "We should make a decision first of all on the carriage of travelers and than on the carriage of goods. The situation, in effect, can be different.
>
> "In the carriage of travelers, there is a double solution possible: either maintaining the text which would consist in engaging the liability of the carrier as soon as the passenger enters the aerodrome, or accepting the suggestion which was made which consists in saying that the liability of the carrier is engaged as soon as the traveler has embarked on the aircraft.
>
> "I point out again that this last solution, practically, is not one at all, and facilitates nothing at all, because the judge will always have to specify the moment when the liability of the carrier begins. In effect, the passenger can have steped [sic] on the step-up of the aircraft, the step-up which is not an actual part of the aircraft, and be injured by another aircraft.
>
> "Be that as it may, the proposal is very clear."

Minutes at 81.

The substantive question was then called to a vote.

So that there could be no doubt as to the precise question on which the delegates were voting, the delegate from Luxembourg emphasized that

> "before deciding to refer to the drafting committee, it is indispensable to vote in the sense of the proposals made by the British delegation, which discriminated very well between the various cases. When the conference will have made a decision on these points which will be submitted to a vote, then the drafting

committee will be able to work in a useful manner."

Minutes at 82.

The Brazilian Delegation likewise reiterated:

".  .  . I draw the attention of the Assembly to that upon which we are going to vote. It's a question of saying, whether the liability of the carrier begins as soon as the traveler enters into the aerodrome, which is a public place, or when he embarks on the aircraft."

Minutes at 82.

Thereafter, a vote was taken and the proposed draft of Article 20 was defeated. Following revision, the current Article 17 emerged from the Drafting Committee and was adopted.

The majority concludes that the debates indicate confusion among the delegates as to the meaning of the rejection of the CITEJA draft. I am unable to subscribe to this position in view of the overwhelming evidence to the contrary. The objections which were voiced to the CITEJA draft of Article 20 and the several amendments which were proposed during the debates all reflect a common desire on the part of those opposed to the draft Article to restrict a carrier's liability for personal injuries to injuries which occurred on board or while the passenger was embarking. Agreement with respect to this limitation among the delegates who were critical of the CITEJA draft was almost universal. Naturally, certain questions were raised as to whether this alternative proposal would cover injuries sustained "in the case of the aircraft which is still in the hanger, which is on the traffic apron, which is taxiing etc.  .  ." Minutes at 77. Questions were also posed as to whether the proposal would cover a passenger injured on the stairway which leads to the interior of the aircraft. Minutes at 78, 81. None of the factual variations or hypothetical possibilities which were raised, however, even remotely suggested that the restrictive proposal might be construed to cover passengers within the terminal. To the contrary, it was in reaction to the imposition of liability under such circumstances that the proposal was conceived.

I therefore believe that in rejecting the CITEJA draft of Article 20, the delegates intended to signify their approval of a proposal which would limit an airline's liability for personal injuries to those injuries which occurred during flight or while the passenger was boarding. Their subsequent adoption of Article 17,must be viewed as an affirmance of this more restrictive concept of liability. It appears likely that the phrase "during the course of any of the operations of embarking" was inserted in order to make explicit that the Article covered the passenger who was on the stairway preparing to enter the airplane in addition to passengers who had already boarded.

If any confusion existed as to the scope of the terms "embarking" and "disembarking", it was limited to the question of whether the Convention embraced accidents which occurred while the passenger was physically proceeding from the terminal to the plane or whether it covered only mishaps during the actual physical process of boarding. At the Fifth International Congress on Air Navigation—held only 1 year after the Warsaw Convention was drafted—a leading expert on air travel, Mr. D. Goedhuis, presented a paper in which he summarized the prevailing interpretations of Article 17 as follows:

"Further, art. 17 mentions 'embarquement' and 'debarquement'. The question is how to explain these words? There are two views *viz*: a) in a broad sense: *i. e.* the embarking begins when the passenger leaves the station-building on his way to the aeroplane, standing in the flying-field; the disembarking ends when the passenger, arrived at destination, enters the station-building; b) in a narrow sense, *i. e.*: the getting on board and the alightment only comprise the actual getting in and out of the aeroplane." D. Goedhuis, *Observations Concerning Chapter 3 of the Convention of Warschau 1929, Cinquième Congrès International de la Navigation Aérienne,* 1–6 Septembre 1931 (The Hague 1931) at 1163–64.

While Mr. Goedhuis advocated amending Article 17 to reflect the broad interpretation of "embarking", he was opposed by others, including at least one delegate to the Warsaw conference itself, who argued that the narrow interpretation which confined liability to accidents occurring during the actual process of boarding, was the proper one. It is significant to note, however, that under either interpretation, the injuries suffered by plaintiffs in the instant case would be outside the scope of Article 17. I therefore conclude that plaintiffs were not injured in the course of "embarking" as that term was restrictively intended.

My conclusion is not altered by the modern legal theories of accident cost allocation on which the Second Circuit relies in part in *Day v. Trans World Airlines, supra.* The Second Circuit finds that a broad construction of Article 17 is appropriate since the airline is in the best position to distribute accident costs among all passengers and to assume preventative measures. While I do not question the soundness of these principles in appropriate contexts, I believe that the explicit goals and policies which were voiced by the delegates to the Warsaw Convention and reaffirmed by the signing of the Montreal Agreement in 1966 foreclose reference to them in defining the scope of Article 17. Had the signatories to the Convention wished to amend it in order to reflect modern developments in American tort law, they could have affirmatively acted in 1966 when the monetary damage limitation was increased and the airline's due care defense was eliminated. Their failure to do so should not be disregarded, particularly if we keep in mind that this is an international agreement.

It is also worthy of note that the majority approach will greatly expand the absolute liability of air carriers while, at the same time, inviting drawn out litigation to determine whether or not such liability attaches. The semi-automatic approach to determining absolute liability which I suggest would seem to more nearly accord with the intent of the drafters of the treaty and the objectives sought to be accomplished.

Having concluded that plaintiffs were injured at a location which was neither exposed to the hazards of air travel nor within the delegates' intended scope of coverage, I would ordinarily end my analysis. However, in view of the majority's emphasis on the activity in which plaintiffs were engaged at the time of injury, I feel compelled to state briefly my views as to the relevance of this factor and to address the majority's argument.

An examination of an individual's activity is only necessary, I believe, once it has been determined that the individual was situated in the immediate vicinity of an airplane where the risks of air travel are logically encountered. Obviously, the physical activity of walking toward a plane on the traffic apron or ascending the stairway to the plane's interior is no different than the activity in which a passenger engages at numerous locations within an airport. The distinguishing feature, therefore, must be the location at which this activity is performed.

Location, while important in identifying the potential class of passengers entitled to recover, is nevertheless not conclusive as to whether an individual passenger was injured while engaged in the operation of embarking. Rather, the injured victim's conduct must also be scrutinized in order to determine whether, objectively viewed, his activities were within the scope of Article 17. Clearly, an individual who is injured at a dangerous location while on a lark of his own cannot be said to be "embarking" and should not be permitted to recover under the Convention. Only those passengers who have departed from the safety of the terminal and are engaged in the activity of boarding or any of the steps which immediately precede boarding should be granted recovery.

Although conceding that plaintiffs had not completed the preliminary steps necessary to boarding their flight in that they had not been searched and had not departed from the search area to board the bus which would take them to their awaiting flight,

the majority nevertheless concludes that by standing in line waiting to be searched, plaintiffs were engaged in the activity of embarking. It bases this conclusion on a finding that TWA has assumed control over the passengers and on its belief that terrorist attacks within an airport are inherent risks of modern air travel.

With respect to its assertion that TWA had assumed control over its passengers, the majority proves too much. It cannot be gainsaid that passengers who are actually boarding and even those who are proceeding from the terminal to the plane on the traffic apron are subject to the airline's authority. Control is therefore inherent under the more restrictive interpretation of Article 17 which I have proposed.

It is equally clear, however, that passengers at many locations within the terminal are also, to a large extent, under the control of the airline. The majority's control analysis is therefore, at best, imprecise. In apparent recognition of the over-inclusiveness of its control classification, the majority seeks to impose yet another restriction on the class of persons who are entitled to recover under Article 17, namely, membership in an identifiable group associated with a particular flight and located within a specific geographical area designated by the airline. In effect, however, this additional restriction elevates location to a position of critical importance. Control becomes a mere artifice to permit recovery within the terminal, yet under limited circumstances. *Blumenfeld v. Bea,* 1962 Z. Luft. R. 78 (Berlin Court of Appeals 1961), relied on by the majority, suffers from the same infirmity.

I therefore conclude that the factors relied upon by the majority in support of its conclusion that plaintiffs were engaged in the activity of embarking are largely irrelevant. Since I believe that plaintiffs' location within the airport terminal precludes their recovery under Article 17, I would affirm the judgment of the district court.