Michael SWEIS, et al., Plaintiffs,

v.

TRANS WORLD AIRLINES,
INC., Defendant.

No. 87 C 717.

United States District Court,
N.D. Illinois, E.D.

Feb. 24, 1988.

Kenneth C. Miller, Corboy & Demetrio, P.C., Chicago, Ill., for plaintiffs.

Robert J. Verrandó, James F. Murphy, Conklin & Adler, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Michael, Aida, Sayel, Saeid, Juliet and Janet Sweis (collectively "Sweises") have sued Trans World Airlines, Inc. ("TWA") for damages arising from a terrorist attack that occurred in the terminal building of Rome's Leonardo Da Vinci Airport on the morning Sweises (other than Michael) were scheduled to fly on TWA to Chicago. Sweises have moved to strike an affirmative defense advanced by TWA, while TWA has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on one count of the Complaint. For the reasons stated in this memorandum opinion and order, Sweises' motion to strike is denied and TWA's motion for summary judgment on Count II is granted.

### Facts [1]

On December 27, 1985 Sweises arrived at the airport about 8:50 a.m. Michael was scheduled to travel to Jordan on Alia Airlines much later that day,[2] while the rest of the family held tickets on TWA Flight 841 for an 11:00 a.m. departure to New York, then on a connecting flight to Chicago. Upon their arrival Sayel went to a snack bar in the terminal building's main lobby,[3] while the rest of the family went to the TWA check-in counter, also in the main lobby. At about 9:10 a.m., after the family had obtained boarding passes and while their baggage was being checked,[4] terror-

---

1. Under familiar Rule 56 principles this Court must draw all reasonable inferences regarding factual matters in the light most favorable to the non-movants—in this case Sweises. This factual statement is taken from TWA's "Statement Pursuant to Northern District of Illinois General Rule 12(e)" ("Rule 12(e) Statement") and Sweises' Complaint. At least for the purposes of this motion, there are no factual disputes.

2. Complaint Count II ¶ 1 says Michael was also to take Flight 841. TWA's Rule 12(e) Statement ¶¶ 1 & 2 say this was not so. P.R.Mem. 1

concedes "for the purposes of this Motion" that Michael did not have a ticket for Flight 841.

3. Though the Complaint makes no specific mention of Sayel's location, Count I ¶ 6 suggests all plaintiffs were at the ticket counter. TWA's Rule 12(e) Statement ¶ 5 asserts Sayel's side trip, and Sweises do not contest the assertion.

4. TWA's Rule 12(e) Statement ¶ 8 suggests the family may not have just obtained their boarding passes but acknowledges Sweises' account must be credited on this motion.

ists attacked the airport with grenades and machine guns, injuring Sweises.

TWA's ticket counter is located outside the "sterile area" of the airport. After checking bags and obtaining boarding passes, passengers may proceed to the Transit Hall by passing through passport control and security, where they are screened for weapons. Passengers may then wait in the Transit Hall until their flight is called. Throughout that waiting period, passengers are free to move about the airport and patronize the many concessions there.

### Contentions of the Parties

Complaint Count I alleges TWA was negligent in allowing the attack to occur. That count is not affected by the current motions. Count II is brought under the provisions of the Warsaw Convention (the "Convention")[5] as supplemented by the Montreal Agreement (the "Agreement")[6]. Taken together, those treaty and contractual obligations impose strict liability on international air carriers and impose a $75,000 limit on any carrier's liability to any passenger.

TWA answered the Complaint, denying that the Convention applied.[7] It also advanced an affirmative defense that repeated that denial but asserted that if the Convention did apply, its liability limitation applied as well.

### Motion To Strike

Sweises have tendered what their counsel styles a "Motion To Strike" TWA's affirmative defense under Rule 12(f). Yet it is clear from the memoranda filed in support of the motion that Sweises do not want that result. Their counsel nowhere argues the $75,000 liability should not apply to Sweises' claim under the Convention. Rather he contends the Convention (and thus by necessity its liability limitation) *does* apply. Indeed, Count II seeks only $75,000 on behalf of each of the Sweises.

What counsel really seems to want is summary judgment as to liability on Count II, based on a determination that the Convention does apply. Accordingly, the motion to strike is denied.

### Summary Judgment

TWA responded to Sweises' motion with a memorandum purporting to support its motion for summary judgment on Count II, arguing the Convention does not apply. When Sweises noted there was no such motion pending, TWA filed one. While the route to this juncture has thus been irregular (certainly not the great circle route one would have hoped TWA would chart), the parties have fully briefed the issue whether the Convention applies, and they are correct that there are no material factual dis-

---

5. "Warsaw Convention" is the popular (and certainly less cumbersome) term for the "Convention for the Unification of Certain Rules Relating to International Transportation by Air" concluded at Warsaw, Poland on October 12, 1929 and adopted by the United States in 1934. Only the French version of the Convention is official, but the parties have no dispute as to its meaning. This opinion will therefore refer to the English translation set out at 49 U.S.C.A. § 1502 note.

6. Unlike the Convention, the Agreement is an accord among international air carriers rather than nations. It was approved by the Civil Aeronautics Board in 1966 (CAB Agreement 18900, Order E–23680, May 13, 1966). By definition the Agreement does not really amend the Convention. Instead the carriers agreed to waive the defense of due care available to them under the Convention (thus imposing strict liability) and to increase the limit on liability from about $8,000 to $75,000.

7. TWA's Answer denied everything in the Complaint with the exception of the fact that it is in the business of transporting passengers by hire. That sort of broad-brush denial violates Rule 8(b) (and perhaps Rule 11 too), as well as causing confusion for the litigants and for the court. For example, TWA's answer to Count II ¶ 5, which in part alleges TWA was a signatory to the Agreement, is a general denial followed by the puzzling statement that "if transportation of any passenger of flight 841 was 'international transportation' as the [sic] defined in article 1 of the Warsaw Convention, that transportation will also be subject to Montreal Agreement." Is that an admission that TWA signed the Agreement? An assertion that the Agreement applies even if TWA did not sign? Even in a notice pleading regime, the purpose of pleadings is to frame the issues rather than obscure them. This sort of careless pleading must be discouraged. In any event, it is clear from TWA's memorandum that it *is* a signatory to the Agreement.

putes. Accordingly a decision on TWA's motion is appropriate.

Both the Convention and the Agreement apply when:

    1. Any passenger is traveling in "international transportation" as defined in Convention Article 1.

    2. That passenger's ticket contains a statement that his or her travel is subject to the Convention and Agreement and has been delivered as defined in Convention Article 3.

Each of these requirements is met as to TWA for each of the family members except Michael. But because Michael was not a TWA passenger, summary judgment in favor of TWA on his Convention claims is plainly appropriate. Sweises concede as much.

Under the Convention a carrier's liability to its passengers is governed by Article 17:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

There are two exceptions—passenger's contributory negligence (Article 21) and carrier's wilful misconduct (Article 25)—but no one suggests either applies here. In addition, while terrorist attacks might not seem at first thought to be "accidents," they have universally been held to be so (e.g., *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976)) and TWA does not contend otherwise. Because Sweises were obviously not "on board the aircraft," only one issue is posed by the present motion: Did the accident that caused the injuries take place "in the course of any of the operations of embarking"?

Interpretation of the Convention must, of course, begin "with the text of the treaty and the context in which the written words are used" (*Air France v. Saks*, 470 U.S. 392, 396–97, 105 S.Ct. 1338, 1341, 84 L.Ed. 2d 289 (1985)).[8] If text and context are not enough, the court "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties" (*id.* at 396, 105 S.Ct. at 1341, quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943)).[9]

Sweises say because they were checking their baggage and obtaining boarding passes at the time of the attack, they were engaged in one of the operations of embarking. That does not overly strain the word "embark" taken alone—two of its accepted meanings are "to make a start" and "to engage, enlist or invest in an enterprise" (Webster's Third New International Dictionary at 739 (1976)). But that certainly cannot be the meaning of the word in the

---

**8.** As n. 5 suggests, the words of the Convention are in French, as is much of the "legislative" history. *Air France, id.* at 399, 105 S.Ct. at 1342 therefore held the Convention must be interpreted in light of the French legal meaning of its terms. While both parties have provided this Court with the English translation of a few French words, neither has addressed the meaning the French legal system would apply to the critical phrase. This Court is not equipped on its own to launch an inquiry, in French, into French law. Instead it must assume (as the parties apparently have) that here as in *Air France* (*id.* at 399–400, 105 S.Ct. at 1342–1343) the meaning French courts would give the French text corresponds to the meaning courts of the United States would give the English terms.

**9.** TWA Mem. 14–18 and 18–21 contain careful arguments in support of its position, based respectively on the legislative history and the later practical construction of the Convention. Sweises disdain any such inquiry, arguing air travel has changed a lot since 1929 and public policy considerations argue in favor of making TWA liable. True enough, today's airports are a far cry from the aerodromes of 1929. But while there have been proposals to amend Article 17, its language remains the same. Thus if this Court were to conclude the framers of Article 17 intended a carrier's liability to begin (for example) at the steps of the plane, it might be necessary to decide how to effectuate that intent when a jetway is used rather than stairs. But the first inquiry must still be as to the framers' intent. This court is not free to make its own policy judgment about where the line should be drawn.

context of a treaty fixing air carriers' liability to their passengers—after all, Sweises "embarked" in that same sense when they started for the airport. Certainly the Convention did not contemplate carrier liability that far afield. Moreover, the term "embark" is paired with "disembark," a word of narrow meaning: It is defined only as "to go ashore out of a ship" and "to get out of any vehicle" (*id.* at 648). Normal reading would treat the terms as a matching pair, so that the correspondingly limited meaning of "embark" would also apply.[10]

If this Court were writing on a clean slate, that would end the matter. On a plain-language approach, the carrier's liability *under the Convention*[11] would seem to be limited to when the passenger is actually on the plane or physically getting in or out of the plane. But, to mix a metaphor, the waters have been muddied.

*Day*, 528 F.2d 31 arose from a terrorist attack in Athens similar to the one here. There the plaintiffs were standing in line at the boarding gate, waiting to be searched before boarding their flight, when the attack came. In that circumstance the Second Circuit concluded the passengers were engaged in an operation of embarking (*id.* at 33–34):

> Whether one looks to the passengers' activity (which was a condition to embarkation), to the restriction of their movements, to the imminence of boarding, or

even to their position adjacent to the terminal gate, we are driven to the conclusion that the plaintiffs were "in the course of embarking."

*Day* was followed almost immediately in *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3d Cir.1977) (en banc), which—not surprisingly, because it involved other passengers in the same line at the same boarding gate subjected to the same attack—reached the same conclusion. Two other Circuits have also looked to the four *Day* factors but have found the passengers in their cases to be outside the provisions of Article 17 (*Martinez Hernandez v. Air France*, 545 F.2d 279, 283–84 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977); *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977)).[12]

TWA says *Day* was wrongly decided and mounts a frontal attack on its doctrine. TWA reads the legislative history and contemporaneous understanding of Article 17 as applying strict liability only when passengers are actually boarding or "deplaning" the aircraft (and perhaps when they are crossing from aircraft to terminal). TWA's argument has plausibility and, while no United States court has *held* Article 17 is that limited, several judges and commentators have criticized *Day's* interpretation of the legislative history.[13]

---

**10.** Indeed, the corresponding meaning of "embark"—"to go on board a boat or airplane for transportation"—is Webster's *first* listed definition (normally the indication of primary meaning). That is unsurprising, given the word's derivation from "bark" (or the French "barque") —a ship.

**11.** This qualification is important. Any conclusion that TWA is not strictly liable under the Convention does not preclude recovery for its negligence—indeed it may pave the way for such an action to proceed. Many of Sweises' arguments supporting strict liability are claims that TWA was negligent in having its check-in counter outside the sterile area. That may be relevant to Sweises' Count I claim (depending on the governing law), but it has no relevance to whether the Convention has made TWA strictly liable.

**12.** Even while *Martinez Hernandez* applied the *Day* test the court also criticized that test, suggesting its own reading of the legislative history of the Convention would lead to a more narrow interpretation of embarkation and disembarkation "as essentially the physical activity of entering or exiting from an aircraft" (545 F.2d at 283–84). Judge Wallace, concurring in *Maugnie* (549 F.2d at 1262–63), also disagreed with *Day* and criticized the majority for reaching out to embrace it when doing so was unnecessary.

**13.** In addition to the First Circuit in *Martinez Hernandez* and Judge Wallace in *Maugnie* (see n. 12), see *Evangelinos*, 550 F.2d at 158–64 (Seitz, C.J., Gibbons and Aldisert, JJ., dissenting); Note, *Warsaw Convention—Air Carrier Liability for Passenger Injuries Sustained Within a Terminal*, 45 Fordham L.Rev. 369, 380–82 (1976).

But to decide this case it is unnecessary to choose between the *Day* approach and TWA's position. Neither alternative imposes liability on TWA under the Convention. It takes only a brief review of each of the four factors in *Day* to show why this is so.

As for the first factor—the activity in which the passenger is engaged—in *Day* the passengers were standing in line to be searched before boarding, which the court characterized as a "condition of embarkation" (528 F.2d at 33). Sweises were checking their baggage and obtaining boarding passes, also conditions of embarkation. But compared to the *Day* plaintiffs, Sweises' activities were several steps further removed from actual boarding. They still had to go through passport control and a security check, make their way to the boarding gate and wait for their flight to be called. No case applying *Day* has found Article 17 to apply at a stage of the departure process so remote from physical embarkation.[14]

As for the second factor—carrier restriction of the passengers' movements—the *Day* plaintiffs were told by airline personnel to stand in line at the boarding gate. They had to obey if they wanted to go on their flight. Sweises stress that factor, noting that TWA required them to obtain boarding passes and chose the location of the ticket counter outside a sterile area.[15] But Sweises were not in TWA's control in the same sense as the plaintiffs in *Day*. TWA employees had not told them to go someplace at a specific time as in *Day*. Rather, TWA required them to get a boarding pass at its counter at some time. It is also unclear that each of the Sweises had to go to the counter to get a pass. Sayel had gone elsewhere. Finally, unlike the situation in *Day*, TWA had not segregated its passengers from those on other flights (or even other airlines): Michael was with the rest of the family and he was not a TWA passenger.

As for the third factor—the imminence of actual boarding—in *Day* the plaintiffs were a few moments from getting on the aircraft. Here departure was not scheduled until two hours after the attack. Boarding can hardly be said to have been imminent.

As for the final factor—physical proximity to the plane or the boarding gate—in *Day* the plaintiffs were a few feet from the boarding gate and 250 meters from the plane. Here Sweises were about 620 feet (by the most direct route) from the boarding gate, and their plane had not yet even landed in Rome (Rossi Aff. ¶¶ 16 and 17).

Thus, on all four factors identified in *Day* this case presents no really persuasive reason to apply Article 17—each factor has a far more attenuated nexus than in *Day* to the primary "embarkation" concept of physical boarding of the aircraft. And there is another practical reason supporting the conclusion that Article 17 should not apply. When the Convention governs, its provisions supplant local law. There may be substantial variance between the agreed international rule and the local rule. It makes sense that there ought to be a point at which the Convention's provisions attach at the beginning of the trip, and another where they end once the trip is over.

Yet to accept Sweises' position would have passengers "wandering" in and out of the Convention's coverage. Passengers might be seen as under a carrier's control or in sufficient proximity to the gate at any number of points after arriving at the air-

---

**14.** In *Martinez Hernandez* terrorists attacked while the passengers were claiming their baggage, which would seem the analogue in the disembarking context to checking baggage in the embarking context. There the court determined the passengers were no longer disembarking.

**15.** Sweises have offered no *evidence* supporting their contention that TWA controlled those deci-

sions, relying instead on counsel's unsupported assertions in legal memoranda. That is of course impermissible on a summary judgment motion (*International Union of Operating Engineers v. Centor Contractors, Inc.,* 831 F.2d 1309, 1313 n. 4 (7th Cir.1987)). But here it does no harm to assume Sweises are right, for the issue is immaterial.

port, but not at others.[16] For example, had Sweises left the check-in counter to go (say) to a lunchroom elsewhere in the airport once they had obtained boarding passes, the analysis they urge would treat them as no longer being in an operation of boarding. Then when going through security they might again be boarding (depending on how the *Day* factors are assessed). Then when left to their own devices in the Transit Hall, they would again not be boarding and would be subject to local law. Obviously the variations could be multiplied.

It is always necessary to draw lines in shaping legal rules, even if it is not possible to say precisely where the lines should be drawn before a specific case presents itself. Yet it is generally preferable to draw fewer lines rather than more—if only for the sake of simplicity and certainty. This Court need not resolve whether the one line needed to give Article 17 meaning should be drawn at the terminal wall, as TWA suggests. Rather it is enough to say that the Convention has clearly drawn the line at some point much closer to actual boarding than where Sweises were.

### Conclusion

Sweises' motion to strike TWA's affirmative defense based on the Convention is denied.[17] TWA has shown there is no dispute as to any material fact and it is entitled to a judgment on Count II as a matter of law. Count II is accordingly dismissed. At this point the Count I negligence claim remains, so the parties are directed to appear on March 7, 1988 at 9:00 a.m. to discuss preparation for trial.

---

**16.** See, e.g., *Rolnick v. El Al Israel Airlines, Ltd.,* 551 F.Supp. 261, 263–64 (E.D.N.Y.1982), where passengers were injured while walking to passport control, after having obtained boarding passes and checked their bags. Applying *Day,* the Court found Article 17 nonapplicable.

**17.** This really is a technicality. Because the Convention does not apply, its liability limits do not either. Hence the defense is moot.