[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2002
THOMAS K. KAHN
CLERK

No. 01-15566

_____

D. C. Docket No. 00-03425-CV-AJ

RICHARD C. MAROTTE, SR.,
OLYMPIA MAROTTE, his wife,

Plaintiffs-Appellants,

versus

AMERICAN AIRLINES, INC., a foreign corporation,
MADELINE BARRETT,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 12, 2002)**

Before TJOFLAT, COX and MAGILL*, Circuit Judges.

_____

*Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

MAGILL, Circuit Judge:

Richard C. Marotte, Sr., and Olympia Marotte, husband and wife, appeal the district court's adverse grant of summary judgment in favor of American Airlines. See Marotte v. Am. Airlines, Inc., 159 F. Supp. 2d 1374 (S.D. Fla. 2001). This case arises out of an incident that occurred in the Miami Airport on the final leg of the Marottes's international flight from New York to the Bahamas. The issue presented on appeal is one of first impression in this circuit. Our jurisdiction is proper pursuant to 28 U.S.C. § 1291. For the reasons stated below, we affirm.

## I.

For purposes of this appeal, the following facts are undisputed. On August 20, 1996, Mr. Marotte, Mrs. Marotte, their son Richard, and his girlfriend attempted to board their scheduled American Airlines flight from Miami to New York. The flight in question was to be the final leg of their round-trip travel from New York to the Bahamas. Upon arrival at the gate, Mrs. Marotte searched for, but was unable to find, the party's tickets and boarding passes. Nevertheless, Mr. Marotte asked the gate attendant if his party could board the plane because computer records showed that the tickets had been paid for and that seat assignments had already been assigned. Also, Mr. Marotte explained to the attendant on duty that he wanted to board the plane as soon as possible because he

2

recently had heart bypass surgery, was diabetic, and at that time was not feeling well.  In response, the gate attendant called her supervisor, Madeline Barrett, who informed Mr. Marotte that he would have to purchase new tickets if he wanted to board the flight.  Despite Barrett's rebuke, Mr. Marotte repeatedly requested to board the plane because of his condition.  His requests, however, were of no avail because Barrett refused to permit the Marotte party to board without buying new tickets.

In an attempt to solve this dispute, Mr. Marotte called American Express, the company through whom he had initially purchased the tickets, to see if it would pay for a new set of tickets.  During this time, Mrs. Marotte found all of the tickets and boarding passes in her pocketbook.  As a result, Barrett began to yell at Mrs. Marotte saying that if she had not been so lazy in searching for and negligent in not finding the tickets, she (Barrett) would not have had to go through so much trouble.  Mr. Marotte complained to Barrett about her behavior, and Mrs. Marotte took down Barrett's name to report her actions.

With the Marotte party still in possession of their tickets and boarding passes, they started walking toward the glass door that leads to the jetway.  Before passing through, Barrett ordered that the door be shut.  Next, Barrett began yelling at the party, got up out of her chair, and approached Mr. Marotte.  Barrett then

punched or pushed Mr. Marotte in the chest, and as a result Mr. Marotte was knocked against the door and fell to the ground.  Barrett then kneeled on top of Mr. Marotte, grabbed all of the party's tickets and boarding passes, tore them up, called security, told security to call the police, and directed other airline personnel not to let the Marotte party board the plane.

Eventually, Mr. Marotte was taken by ambulance to a hospital, where he remained for a number of days.  Mrs. Marotte stayed in Miami with her husband until he was released from the hospital.  The Marottes's son and his girlfriend returned to New York the next day.

Almost four years later, on August 18, 2000, the Marottes filed their complaint against American Airlines and Barrett in state court in Miami, Florida, claiming numerous counts against each party.  Marotte, 159 F. Supp. 2d at 1376. On September 13, 2000, the case was removed to the United States District Court for the Southern District of Florida.  Upon removal, American Airlines moved for summary judgment on the grounds that the action was governed by the Convention for the Unification of Certain Rules Relating to International Transportation by Air, signed at Warsaw, on October 12, 1929 (the "Warsaw Convention" or "Convention"), 49 Stat. 3000, T.S. 876 (1934), reprinted in note following 49 U.S.C. § 40105 (1994) (hereinafter "49 U.S.C. § 40105").  If governed by the

4

Warsaw Convention, American Airlines argued, the Marottes's action was barred by that Convention's two-year limitations period.[1] On August 29, 2001, the district court granted American Airlines's motion for summary judgment on the grounds that because the Marotte party was "in the course of embarking" their intended flight within the meaning of the Warsaw Convention, the Marottes's action was time-barred by the Convention's two-year statute of limitations.

On appeal, both parties agree that the Marottes's claims, if covered by the Convention, are time barred because the Marottes completed their travel on or about August 21, 1996, but did not file suit until August 18, 2000, nearly four years after their travel was completed. In light of this, we now determine whether the Convention, and its two-year limitations period, applies.

## II.

### A. Legal Background

The Warsaw Convention was signed in 1929 in order to aid and assist the then-fledgling commercial airline industry. E. Airlines, Inc. v. Floyd, 499 U.S. 530, 546 (1991); see also King v. Am. Airlines, Inc., et al., 284 F.3d 352, 356 (2d Cir. 2002); McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315-16 (1st Cir.

---

[1]The limitations period established by Article 29 of the Warsaw Convention provides that "[t]he right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped." 49 U.S.C. § 40105.

1995). In order to achieve this aim, the Convention sets forth uniform rules for claims that arise out of incidents that occur during international air transportation. El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 169 (1999). The Supreme Court has held that the Warsaw Convention is the exclusive mechanism of recovery for personal injuries suffered on board an aircraft or in the course of embarking or disembarking from an airplane. Id. at 161 ("[R]ecovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' if not allowed under the Convention, is not available at all.") (citations omitted). This is so because "[r]ecourse to local law . . . would undermine the uniform regulation of international air carrier liability that the Warsaw Convention was designed to foster." Id. Article 17 of the Warsaw Convention holds airlines strictly liable for personal injuries that occur in the course of an international flight.[2] It provides:

> [An airline] carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or <u>in the course of any of the operations of embarking or disembarking</u>.

49 U.S.C. § 40105 (emphasis added). Thus, to satisfy Article 17's carrier liability

---

[2]For those interested in a thorough historical analysis regarding Article 17, we direct your attention to the Second Circuit's opinion in <u>Day v. Trans World Airlines, Inc.</u>, 528 F.2d 31, 34-38 (2d Cir. 1975).

provision, a plaintiff must establish three requirements: (1) an "accident" must have occurred; (2) injury or death must have occurred; and (3) the preceding two conditions must have occurred while "embarking or disembarking" or during the flight itself. Here, neither party disputes that Barrett's intentional misconduct satisfies the first prong of the analysis;[3] nor does either party dispute that an actual injury occurred. Accordingly, the only substantive question with which this court is faced is whether, on the facts before us, the Marottes were "embarking" within the meaning of the Warsaw Convention.

The terms "embarking" and "disembarking" are not specifically defined in the Convention. Despite the Marottes's contention to the contrary, however, the definition of the term "embarking" within the Warsaw Convention is a question of law to be decided by the court, not one of fact to be decided by the jury. Blake v. Am. Airlines, Inc., 245 F.3d 1213, 1215 (11th Cir. 2001) ("Construction of the Warsaw Convention is a question of law."). That is, its interpretation is left up to

[3]For purposes of this opinion we will assume, without deciding, that Barrett's conduct is considered an "accident" as contemplated by the Convention because neither party disputes the district court's conclusion on this score. We do note, however, that the Supreme Court has defined the term "accident" under the Convention as "an unexpected or unusual event or happening that is external to the passenger," Air France v. Saks, 470 U.S. 392, 405 (1985), and that other courts of appeals have found intentional misconduct to be covered under the Convention's definition of "accident." See, e.g., King, 284 F.3d at 360; Carey v. United Airlines, 255 F.3d 1044, 1048-49 (9th Cir. 2001); Wallace v. Korean Air, 214 F.3d 293, 298-300 (2d Cir. 2000).

the courts and is dependant upon the facts of each case.  Schmidkunz v.

Scandinavian Airlines Sys., 628 F.2d 1205, 1207 (9th Cir. 1980).  Therefore, we

must now determine whether, on the undisputed facts stated above, the Marottes

were "in the course of any of the operations of embarking."

As noted above, the term "embarking" is not defined in the treaty, nor has

this court had an opportunity to define the contours of the term.  However, this

does not mean that we write on a clean slate.  In fact, numerous courts of appeals

decisions from other circuits have addressed this issue.  Our opinion today joins in

the reasoning of our sister circuits.

Generally, when determining whether an airline is liable under Article 17 of

the Warsaw Convention, courts employ a totality of the circumstances approach.

Maugnie v. Compagnie Nationale Air France, 549 F.2d 1256, 1262 (9th Cir. 1977).

In making this determination, three factors are particularly relevant: (1) the

passenger's activity at the time of the accident; (2) the passenger's whereabouts at

the time of the accident; and (3) the amount of control exercised by the carrier at

the moment of the injury.  See, e.g., McCarthy, 56 F.3d at 317; Schroeder v.

Lufthansa German Airlines, 875 F.2d 613, 617 (7th Cir. 1989); Evangelinos v.

Trans World Airlines, Inc., 550 F.2d 152, 155 (3d Cir. 1977) (en banc); Maugnie,

549 F.2d at 1261-62; Day, 528 F.2d at 33.  Additionally, courts also consider the

imminence of the passenger's actual boarding of the flight in question. Buonocore

v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir. 1990). Under this analysis,

no single factor is dispositive, and the three factors form a "single, unitary

[analytical] base." McCarthy, 56 F.3d at 317. However, because the term

"embarking" evokes a "close temporal and spatial relationship with the flight

itself," a close connection between the accident and the physical act of boarding the

aircraft is required. Id. at 316-17.[4]

## B.    Legal Analysis

Viewing the total circumstances surrounding the incident in question, with

particular emphasis placed on location, activity, control, and the imminency of the

intended flight, leads us to the firm conclusion that any injury that Mr. Marotte

suffered due to the attack by Barrett occurred in the process of embarking, as

contemplated by the Warsaw Convention. First, as the Marottes readily admit, the

party had their boarding passes in hand and were attempting to board the plane

---

[4]Seemingly ignoring these cases, the Marottes asks us "to adopt the view that a passenger is only 'embarking' after the ticket has been collected and honored for travel and the passenger is passed through [the] gate check where the boarding stub is given [sic] the passenger to be examined by the attendant on the plane." In other words, the Marottes ask this court to draw a bright-line at, what appears to be, the actual doorway to the jetway leading to the aircraft. Such a position based on arbitrary line-drawing "is both too arbitrary and too specific to have broad application." Evangelinos, 550 F.2d at 155; see also Buonocore, 900 F.2d at 10 (drafters of the Warsaw Convention "intended a flexible approach which would adapt to the changing conditions of international air travel over the years"). Because treaties should generally be read to have broad applicability, we reject the Marottes's position and adopt the broader position of at least five other circuits.

9

when the attack took place.  This is significant because it shows that the Marottes

had already passed through security and were in a section of the airport that is not

open to the general public, but rather only to ticketed passengers.  McCarthy, 56

F.3d at 318.  Further, it evinces that the Marottes had satisfied almost all of the

conditions precedent to boarding.  Id. at 317; see also Evangelinos, 550 F.2d at

156; Day, 528 F.2d at 33.  Second, the door into which Mr. Marotte was pushed

was the door leading to the actual aircraft he had hoped to board, evincing an

extremely close spatial relationship between the attack and the aircraft.  Third, as

the facts clearly show, American Airlines exerted much control over the Marottes.

By taking their boarding passes and tickets and forbidding them access to the

jetway that led to the airplane they wished to board, American Airlines, through its

employee Barrett, exerted control over the entire Marotte party.  Furthermore, by

jumping on top of Mr. Marotte, Barrett physically prevented him from boarding his

intended flight.[5]  It is difficult to imagine a situation that more clearly establishes

control then the act of physical restraint.  Finally, it is apparent from the facts

---

[5]Any suggestion by the Marottes's counsel that finding the Warsaw Convention applicable would reward American Airlines for Barrett's behavior, and effectively deny the Marottes any remedy under the law, is undermined by our decision today.  By finding the Convention applicable to the facts before us, our opinion makes clear that the Marottes had a remedy under the Warsaw Convention so long as they filed suit within two years of completing their intended travel.  For whatever reason, however, the Marottes failed to file within the required two-year window and accordingly their claims are barred by the Convention's limitations period.

before us that the flight in which the Marottes were attempting to board was imminent. All the Marottes had to do was pass through the glass door, which Barrett ordered closed, walk down the jetway, and take their seats. The fact that they were prevented from doing so, without more, does not take this case, on the facts before us, out of the purview of the Warsaw Convention. Viewing the surrounding facts in totality, as we must, we conclude that the Warsaw Convention applies to the Marottes's claims, and therefore those claims are barred by the Convention's two-year limitations period.[6]

## III.

Accordingly, we affirm the district court's grant of summary judgment in favor of American Airlines. To find the Warsaw Convention inapplicable would require us to draw a bright-line at the jetway or the actual door of the aircraft. We decline to do so for the reasons set forth above.

AFFIRMED.

---

[6]Because the Marottes did not raise the issue of failure to provide medical assistance below, the issue has been waived. Leal v. Ga. Dept. of Corr., 254 F.3d 1276, 1280 (11th Cir. 2001).