**Dr. Kamyar KALANTAR,**
**et al., Plaintiffs,**

v.

**LUFTHANSA GERMAN AIRLINES,**
**et al., Defendants.**

**No. CIV.A.01 CV 00644 (HHK).**

United States District Court,
District of Columbia.

April 10, 2003.

---

Afshin Pishevar, Rockville, MD, for Plaintiffs.

Thomas James Whalen, John Joseph Delaney, Condon & Forsyth, Washington, DC, for Defendants.

Carolyn A. McKee, U.S. Dept. of Justice, Washington, DC, for Non Party.

## MEMORANDUM OPINION AND ORDER

KENNEDY, District Judge.

Plaintiffs, Dr. Kamyar Kalantar, an Iranian-born physician who is a permanent resident of the United States, and his wife, Dr. Grace Lee, bring this action against Lufthansa German Airlines ("Lufthansa") and two of its employees, Ziba Vali–Coleman and Juergen Starks, challenging the airline's allegedly discriminatory practices. Plaintiffs claim that on March 25, 2000, Kalantar was not allowed to board a Lufthansa flight to Germany after he refused to allow his luggage to be searched.[1] Plaintiffs assert that defendants' insistence that Kalantar allow his luggage to be searched as a condition of his being allowed to board the flight to Germany, something not required of other passengers, was an unlawful discriminatory act based on Kalantar's race and/or national origin. Plaintiffs also allege that Lufthansa personnel made defamatory statements against Kalantar and, without justification, caused him to be arrested.

Presently before the court is defendants' supplemental motion for summary judgment. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that defendants' supplemental motion must be denied.

## I. BACKGROUND

### A. Factual Background

Having attended a Renal Physician Association conference at the Mayflower Ho-

---

1. The luggage that defendants insisted on searching were not carry-on items but, rather, were pieces of luggage that are customarily checked at the ticket counter, tagged, and then transported on the same plane carrying the passengers, but held in a section of the plane devoted to the passengers' luggage.

tel in Washington, D.C., Kalantar arrived at Dulles Airport shortly after 4:00 p.m. on March 25, 2000, roughly an hour and a half before his anticipated flight to Frankfurt, Germany. Upon arriving at the Lufthansa ticket counter, Kalantar presented his ticket and luggage to a Lufthansa agent who took his luggage and secured a boarding pass. Another agent, defendant Ziba Vali–Coleman, however, refused to give the boarding pass to Kalantar stating that, because Kalantar had an Iranian passport, his luggage had to be searched before he would be allowed to board. In response to Kalantar's request for further explanation, Vali–Coleman told Kalantar that she was acting pursuant to a Federal Aviation Administration ("FAA") security directive. According to Kalantar, when he asked Vali–Coleman to produce the directive so that he could review it, she declined to do so and, within earshot of other passengers, told Kalantar that "he must know that the United States Government is against all Iranians" and that he is a security threat. Am. Compl. ¶ 7. Thereafter, when Kalantar refused to leave the Lufthansa ticket counter and persisted in his refusal to allow a hand-search of his luggage, Lufthansa personnel called the police. The police then arrived at the scene and eventually arrested Kalantar and took him away in handcuffs. This action followed.

## B. Procedural Background

On March 23, 2001, plaintiffs filed the instant complaint alleging several causes of action, including race and national origin discrimination, defamation, false imprisonment, and intentional infliction of emotional distress. After answering the complaint, defendants filed an *ex parte* motion for summary judgment under seal. In their summary judgment motion, defendants argued that they are entitled to judgment as a matter of law because their conduct towards Kalantar, was proper-indeed compelled-under an FAA security directive which, by law, they could not disclose.[2] Plaintiffs responded to defendants' *ex parte* motion by filing a motion to strike. In the alternative, plaintiffs proposed that their attorney, Afshin Pishevar, be permitted to review the motion subject to a court order that he not disclose any information regarding the security directive to anyone, including plaintiffs.

On January 3, 2002, the court held a hearing on plaintiffs' motion. At the hearing, counsel for defendants informed the court that he had informed the FAA in writing about this lawsuit and inquired whether Lufthansa would be permitted to disclose the contents of the security directive to Kalantar or his attorney. Counsel stated that Carla Martin, an FAA "department head," in a telephone conversation told him that, in similar circumstances, the FAA had consented to the disclosure of a security directive to counsel for a party in litigation. Consent to disclose the security directive to Kalantar or to his attorney would be withheld in this case, however. Defense counsel explained that Kalantar and his attorney are "involved in advocacy groups for Iranians fighting discrimination" and have a connection with a pro-Iranian website discussing supposed discrimination against Iranians in various forums including the

---

**2.** Federal regulations require that an aircraft operator that receives a security directive must: "(1) Restrict the availability of the Security Directive ... and information contained in the Security Directive ... to those persons with an operational need to know; and (2) Refuse to release the Security Directive ... and information regarding the Security Directive ... to persons other than those with an operational need to know...." 14 C.F.R. § 108.18(d) (2001) (current version at 49 C.F.R. § 1544.305(f) (2003)). These security requirements apply equally to foreign carriers. 14 C.F.R. § 129.25 (2003).

airline industry and specifically by Lufthansa. Hr'g Tr. at 24–25. According to defense counsel, on this website, "[t]here is a list of attorneys whom people can contact if they feel they've been discriminated against because of their Iranian heritage and Mr. Pishevar is listed there. He is, also, listed as one of the board of directors or some sort of executive officer of the group." *Id.* at 25.[3]

Following the hearing, the court issued an order on February 21, 2002, *inter alia,* requiring: (1) defense counsel to disclose defendants' summary judgment motion to counsel for plaintiffs by March 18, 2002; (2) plaintiffs' counsel not to reproduce defendants' summary judgment motion or disclose its contents to anyone, including his clients, and to return the motion to defense counsel immediately after the court's ruling on defendants' motion for summary judgment; and (3) defense counsel to deliver a copy of the court's order to Jane Garvey, Administrator of the FAA, and David Leitch, the FAA's Chief Counsel by no later than March 4, 2002.

In response to the court's February 21, 2002, order and pursuant to 28 U.S.C. § 517 (2000),[4] the United States Department of Transportation, Transportation Security Administration ("TSA"), moved to stay the court's order and for leave to file a Statement of Interest.[5] This motion was granted and the United States filed its Statement of Interest on April 10, 2002.

In its statement, the United States explained that the security directive at issue constitutes sensitive security information ("SSI") the protection of which "is critical to the United States' efforts to protect the general public from terrorists attacks like those committed on September 11, 2001," and that disclosure "at this time to anyone without an operational need to know the

---

3. According, to defendants' counsel, Ms. Martin also stated said that the FAA had permitted disclosure of security directives in similar cases to a party's attorney because, unlike in this case, the attorney "[did] not appear to be emotionally or otherwise involved in the issue. And she felt that in those cases there wouldn't be a threat to the information being disseminated." Hr'g Tr. at 25.

Stephen J. McHale, Deputy Under Secretary, Transportation Security Administration, United States Department of Transportation, in a declaration appended to the United States' Statement of Interest states the following:

While it is true that in the past the predecessor of the TSA, the Federal Aviation Administration's Office of Civil Aviation Security, in conjunction with the Chief Counsel's office, made accommodations in federal court litigation that allowed air carrier counsel to provide SSI to opposing counsel pursuant to a strictly controlled confidentiality order, the TSA is unwilling to make any exceptions to the need-to-know category at the present time. This is due in no small part because of recent intelligence reporting that al-Qaeda militants had obtained access, through media sources and publicly available U.S. Government reports, to information concerning security vulnerabilities at American airports. While we do not know what part such information may have played in the decision to use U.S. civil airliners in the attacks on September 11th, we cannot discount the possibility at this time that SSI provided to those outside the operational need-to-know category could be exploited to further terrorist objectives and put the the public at greater risk.

United States' Statement of Interest, Ex. A ¶ 10 (Decl. of S. McHale).

4. 28 U.S.C. § 517, in pertinent part, provides, "any officer of the Department of Justice, may be sent by the Attorney General . . . to attend to the interests of the United States in a suit pending in a court of the United States . . . or to attend to any other interest of the United States." 28 U.S.C. § 517 (2000).

5. Effective February 22, 2002, the Transportation Security Administration assumed responsibility for aviation security previously held by the Federal Aviation Administration. *See* Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat 597 (2001).

information could jeopardize the safety of the public." United States' Statement of Interest at 1. Recognizing the difficulties presented to the court by the filing of a motion for summary judgment *ex parte* and under seal in order to protect SSI, the United States proposed to make available to the court, *ex parte,* upon the court's request, additional information about the security directive at issue in this case. The United States also advanced the proposition that the court should decide whether plaintiffs' need for the security directive is moot in light of the possible preemptive effect on this litigation of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in note following* 49 U.S.C. § 40105 [hereinafter the Warsaw Convention], a matter not previously brought to the court's attention. Agreeing with the United States that the Warsaw Convention, if applicable to this case, would preempt this suit and render the issue regarding disclosure of the security directive moot, the court ordered the parties to brief the issue. This is the matter that is presently before the court.

## II. ANALYSIS

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Article 17 of the Warsaw Convention

The Warsaw Convention is a comprehensive international treaty governing air carrier liability for "all international transportation of persons, baggage, or goods." 49 U.S.C. § 40105 *et seq.* Article 17, the provision governing liability for personal injury to passengers, establishes that air carriers "shall be liable" for death or other "bodily injury" to a passenger caused by an "accident" that took place "on board the aircraft *or in the course of any of the operations of embarking or disembarking.*" 49 Stat. 3018 (emphasis supplied). Recovery for personal injury claims arising during international air travel "if not allowed under the Convention, is not available at all." *El Al Airlines, Ltd. v. Tseng,* 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). While Article 17 does not mention federal statutory or civil rights claims and *Tseng* did not involve such claims, this court has held that, when applicable, the Warsaw Convention preempts statutory discrimination claims

as well as common law claims. *Gibbs v. Am. Airlines*, 191 F.Supp.2d 144, 148–49 (D.D.C.2002). Consequently, if the Warsaw Convention applies to Kalantar's claims, his remedies are restricted to those that the Convention provides, including no remedy at all. *Tseng*, 525 U.S. at 161, 119 S.Ct. 662.

Defendants argue that Article 17 of the Warsaw Convention operates to preempt plaintiffs' claims in this case. Plaintiffs counter that the Warsaw Convention does not apply to their claims because Kalantar was not in the course of embarking a Lufthansa flight at the time of his injuries.[6] Thus, the merits of defendants' motion turn on whether the injuries plaintiffs claim Kalantar sustained occurred in the course of embarking the Lufthansa flight to Germany on March 25, 2000.

## C. "Embarking" Under The Warsaw Convention

■ The Warsaw Convention does not define the term "embarking." The question of whether a plaintiff was in the course of embarking at the time of her alleged injury is a question of federal law to be decided by the court based on the facts of the case. *Marotte v. American Airlines, Inc.*, 296 F.3d 1255, 1259 (11th Cir.2002); *Schmidkunz v. Scandinavian Airlines, Inc.*, 628 F.2d 1205, 1207 (9th Cir.1980). While the D.C. Circuit has not provided specific guidance on the exact parameters of the term, the decisions of numerous other courts that have examined the issue are quite instructive.

■ Courts that have decided whether a passenger was engaged in the course of embarking an airline flight generally have engaged in a multi-pronged inquiry. This inquiry focuses on: (1) the passenger's location at the time of injury; (2) the passenger's activity at the time of the injury; and (3) the degree of control exercised by the airline over the passenger. *Marotte*, 296 F.3d at 1260; *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 317 (1st Cir.1995); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 617 (7th Cir. 1989); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir.1977); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33–34 (2d Cir.1975). Courts may also consider the imminence of final boarding as a fourth factor. *Marotte*, 296 F.3d at 1260; *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2d Cir.1990); *Day*, 528 F.2d at 33–34.

Most courts have concluded that "embarking" requires a close temporal and physical connection to the actual boarding of an airline flight. *See McCarthy*, 56 F.3d at 316–17 (noting that "most courts have interpreted the term[ ] 'embarking' . . . to connote a close temporal and spatial relationship with the flight itself") The Second and Third Circuits found the Warsaw Convention to apply to injuries that resulted from a terrorist attack where the plaintiffs were waiting in line to pass through a final security check before boarding the airplane. *Evangelinos*, 550 F.2d at 156; *Day*, 528 F.2d at 33–34.[7] In these cases, the passengers had completed almost all of the steps necessary to board the airplane, they were in a restricted area of the terminal and were following the directions of the airline's agents to line up

---

**6.** As Kalantar was quite obviously neither on board an aircraft nor engaged in disembarking from one, Article 17 of the Warsaw Convention will govern Kalantar's claims only if the incident occurred while he was in the course of embarking.

**7.** Two of the plaintiffs in *Day* were being escorted to the departure gate by an airline representative. The rest were waiting in line to be searched. The court found this difference in location to be insignificant. *Day*, 528 F.2d at 32 n. 5.

in preparation for passing through a security check point near the entrance to the plane. Thus, both courts found that the passengers were in the course of embarking when their injuries occurred.

Recently, the Eleventh Circuit found the Warsaw Convention to apply to injuries that occurred when an airline agent prevented a family from boarding the aircraft and physically assaulted the father. *Marotte*, 296 F.3d at 1261. These plaintiffs had passed into the area restricted for passengers; completed almost all of the prerequisite steps for their imminent boarding; and were acting under the direction of the airline agents. Under these circumstances, the court found that the plaintiffs were in the process of embarking on an airline flight.

Similarly, lower courts have found the Convention to apply to injuries sustained when passengers fell while waiting in line to board an airplane. *Barratt v. Trinidad & Tobago Airways Corp.*, 1990 WL 127590, 1990 U.S. Dist. LEXIS 20947 (E.D.N.Y. Aug. 28, 1990) (holding that the Warsaw Convention applies to injuries sustained while descending steps to the tarmac prior to boarding plane); *Jefferies v. Trans World Airlines, Inc.*, 1987 WL 8168, 1987 U.S. Dist. LEXIS 2053 (N.D.Ill. Mar. 17, 1987) (holding that the Warsaw Convention applies to injuries resulting from falling while joining the line to board the plane). In both cases, the plaintiffs had passed through a security check point, were in an area restricted to passengers, and their flights had been called for boarding.

In contrast, courts have found that the Warsaw Convention does not apply to injuries sustained at a greater physical and temporal distance from the boarding of an aircraft. The Second Circuit found that the Convention did not apply to a passenger's injuries resulting from a terrorist attack that occurred while the passenger was still in the main public area, approximately two hours before his flight. *Buonocore*, 900 F.2d at 9. The passenger had already checked his luggage, received his boarding pass, and was headed to a snack cart in the public area at the time of the attack. The court held that he was not embarking at this point, as he had just begun the process leading to boarding the flight, was still in the public area of the terminal, and was far-in time and space-from actually boarding the airplane. *Id.* at 10–11.

The Ninth Circuit similarly found that a passenger injured on a moving walkway in a public area was not embarking at the time of her injuries. *Schmidkunz*, 628 F.2d at 1207. The court found it significant that she was still in the unrestricted area of the terminal; she did not yet have a boarding pass; and her movements at this point were not controlled in any way by airline personnel.

The First Circuit has held that a passenger injured while following an airline agent down an escalator in the public area was not embarking. *McCarthy*, 56 F.3d at 318. In *McCarthy*, the plaintiff and her sister checked in at the ticket counter shortly before the scheduled flight time. To ensure that they made their flight, the agent took their tickets and passports and quickly led the women through the terminal, towards the customs area. The plaintiff was injured as she descended the escalator. The court found that the plaintiff's actions at the time of injury were too remote to constitute "embarking." The court noted that the plaintiff had not fulfilled most of the conditions precedent to boarding. She was still in the public area, was not under the agent's control, and her activity at the time of injury-riding the escalator-was not a prerequisite for boarding. *Id.* at 317–18.

A number of other courts have similarly held that passengers in public areas, at some distance from the gate, and without restrictions on their movements are not governed by the Warsaw Convention. *Patelczik v. Clarkston Travel Bureau, Inc.*, 1993 U.S. Dist. LEXIS 19265 (E.D.Mich. Dec. 21, 1993) (plaintiff injured while waiting for shuttle bus was not embarking as she was still in a public area, and not close to boarding); *Kantonides v. KLM Royal Dutch Airlines*, 802 F.Supp. 1203 (D.N.J. 1992) (plaintiff was not embarking when she was injured on moving walkway in unrestricted area far from boarding time or gate); *Sweis v. Trans World Airlines, Inc.*, 681 F.Supp. 501 (N.D.Ill.1988) (plaintiffs at check-in counter in main lobby two hours before flight were not embarking at time of the terrorist attack); *Rolnick v. El Al Israel Airlines, Ltd.*, 551 F.Supp. 261 (E.D.N.Y.1982) (plaintiffs injured while riding escalator in public area, headed to passport control, were not embarking at time of injuries); *Upton v. Iran Nat'l Airlines Corp.*, 450 F.Supp. 176 (S.D.N.Y. 1978) (plaintiffs waiting in public area for their delayed flight were not embarking at time of roof collapse that caused their injuries); *see also, Aquino v. Asiana Airlines, Inc.*, 105 Cal.App.4th 1272, 1280–81, 130 Cal.Rptr.2d 223 (2003) (plaintiffs denied the right to check-in had not begun the process of embarking).

**D. Kalantar Was Not Embarking**

■ The court's consideration of the decisions of courts that have addressed the question of what constitutes "embarking" for purposes of the Warsaw Convention leads it to conclude that Kalantar was not embarking the Lufthansa flight to Germany on March 25, 2000. While Kalantar had presented his ticket and identification at the Lufthansa ticket counter, an agent had issued a boarding pass and Kalantar was in the process of checking his baggage, these activities were not sufficiently connected to the actual boarding of the plane to constitute embarking on the Lufthansa flight to Germany. First, Kalantar's location at the time of the incident was too remote. He was at the Lufthansa ticket counter in the main terminal of the airport in an area open to the general public and geographically distant from the boarding gate. *See Buonocore*, 900 F.2d at 8; *Schmidkunz*, 628 F.2d at 1205; *McCarthy*, 56 F.3d at 313; *Patelczik*, 1993 U.S. Dist. LEXIS 19265, at *1; *Kantonides*, 802 F.Supp. at 1203; *Sweis*, 681 F.Supp. at 501; *Rolnick*, 551 F.Supp. at 261; *Upton*, 450 F.Supp. at 176.

Second, the incident that gave rise to this suit occurred an hour and a half before Kalantar's flight's departure. Thus, Kalantar clearly was not imminently prepared to board the aircraft. *See Kantonides*, 802 F.Supp. at 1210–11 (finding that an incident occurring one-half hour before the flight's scheduled departure lacked the requisite "immediacy of boarding"); *Sweis*, 681 F.Supp. at 505 (finding that injury occurring two hours prior to scheduled departure was not sufficiently imminent); *cf. Day*, 528 F.2d at 33 (finding it significant that plaintiffs were "virtually ready to proceed to the aircraft").

Third, while Kalantar was completing the initial check-in procedure-exchanging his ticket for a boarding pass and checking his luggage-to be sure an essential part of the boarding process, the check-in procedure is but the first of several required steps a passenger must take prior to boarding an aircraft. The majority of these steps remained ahead for Kalantar. *See Sweis*, 681 F.Supp. at 505 (concluding that even though the initial check-in process is part of the boarding process, it is "several steps further removed from actual boarding" and is too remote to constitute an operation of embarking); *Aquino*, 105

Cal.App.4th at 1280–81, 130 Cal.Rptr.2d 223 (finding that plaintiffs who were not allowed to check-in had not begun the operations of embarkation); *see also, Day v. Trans World Airlines, Inc.*, 393 F.Supp. 217, 221 (S.D.N.Y.1975), *aff'd*, 528 F.2d 31 (2d Cir.1975) (listing the check-in procedures as the beginning of the conditions precedent to boarding the aircraft).[8]

Finally, while the court recognizes that an airline exerts a degree of control over a passengers during the check-in procedure, the court declines to put much emphasis on this factor. It does not appear that, prior to his arrest, Kalantar was unable to request the return of his travel documents and leave the ticket counter at any point.[9] Moreover, if the check-in procedure had gone smoothly, Kalantar would have been released from any sort of airline control, and would have found himself in the airport's public space-a factor that has led many courts to conclude that the Warsaw Convention did not preempt a plaintiff's claims for damages. *See Buonocore*, 900 F.2d at 8; *Schmidkunz*, 628 F.2d at 1205; *McCarthy*, 56 F.3d at 313; *Patelczik*, 1993 U.S. Dist. LEXIS 19265, at *1; *Kantonides*, 802 F.Supp. at 1203; *Sweis*, 681 F.Supp. at 501; *Rolnick*, 551 F.Supp. at 261; *Upton*, 450 F.Supp. at 176. As the court noted in *Sweis*, to accept the position that passengers were under sufficient control at the check-in counter to justify the applicability of the Warsaw Convention "would have passengers 'wandering' in and out of the Convention's coverage" as they proceeded through the various required and discretionary pre-flight activities.[10]

8. Defendants argue that the determination of when a passenger may be said to be embarking depends not on where the plaintiff was located, but rather, "in what activity was he engaged." Def.s' Suppl. Mot. Summ. J. at 8 (quoting *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33 (2d Cir.1975)); *see* Def.s' Reply at 2. This argument ignores the consideration the court must give to other factors. As the First Circuit has noted, "the passenger must not only do something that, at the particular time, constitutes a necessary step in the boarding process, but also must do it in a place not too remote from the location at which he or she is slated actually to enter the designated aircraft." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 317 (1st Cir.1995).

9. Kalantar indicates in his deposition that he felt he could not leave the counter because the Lufthansa agents had possession of his documents and luggage. Kalantar Dep. at 197; 84–85. Kalantar states, however, that he was not physically restrained from leaving the counter by any agents of Lufthansa. *Id.* at 198. He also does not indicate that he actually requested the return of his documents and luggage. *Cf. McCarthy*, 56 F.3d at 318 (rejecting plaintiff's suggestion of airline control in the absence of evidence that the airline refused a request to return plaintiff's travel documents). Furthermore, Ms. Vali-Coleman states in her deposition that Lufthansa never took possession of Kalantar's documents and luggage. Coleman Dep. at 124–25.

10. Rather, the requisite type of control generally appears to exist where the airline has assumed the control of the passengers that will continue until disembarkation. *See Day*, 528 F.2d at 33 (finding that passengers directed by the airline to stand in line for a final security check prior to boarding were under airline's control); *Evangelinos*, 550 F.2d at 156 (finding that the airline was controlling plaintiffs' movements where flight had been called for final boarding and plaintiffs, acting pursuant to instructions, were assembled in specific area for passengers on that flight); *Marotte*, 296 F.3d at 1260 (finding that the airline exerted control by taking plaintiffs' boarding passes and denying plaintiffs the right to enter aircraft); *cf. McCarthy*, 56 F.3d at 318 (finding that an airline agent leading passengers through the public areas while in possession of their travel documents was not in "control" of the passengers); *Sweis*, 681 F.Supp. at 505 (finding that passengers at check-in counter were not under airline control). *But see Baker v. Lansdell Protective Agency, Inc.* 590 F.Supp. 165 (S.D.N.Y.1984) (analyzing plaintiff's loss of luggage at security checkpoint as personal injury under Article 17 and finding plaintiff

*Sweis,* 681 F.Supp. at 505; *accord Evangelinos,* 550 F.2d at 155 n. 8a (suggesting that airline control over passengers at check-in .counter may not be material to the embarkation analysis as that control would be relinquished and reassumed at various later stages).

### III.  CONCLUSION

For the foregoing reasons, it is, this 7th day of August, 2003, hereby

**ORDERED** that defendants' supplemental motion for summary judgment is **DENIED;** and it is further

**ORDERED** that defendants may file their motion for summary judgment as redacted by the Transportation Security Administration and filed under seal on April 10, 2002.

was under sufficient control when acting at direction of airline's agent in relinquishing

luggage for inspection).